# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE THE BOEING COMPANY      )      C.A. No. 2019-0907-MTZ
DERIVATIVE LITIGATION         )

## MEMORANDUM OPINION
Date Submitted: June 25, 2021
Date Decided: September 7, 2021

Joel Friedlander, Jeffrey M. Gorris, and Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Richard M. Heimann and Katherine Lubin Benson, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California; Steven E. Fineman, Nicholas Diamond, Sean Petterson, Rhea Ghosh, and Kartik S. Madiraju, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, New York, New York, *Attorneys for Co-Lead Plaintiffs*.

Blake Rohrbacher, Kevin M. Gallagher, and Ryan D. Konstanzer, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joshua Z. Rabinovitz, KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Defendants and Nominal Defendant The Boeing Company*.

**ZURN, Vice Chancellor.**

A 737 MAX airplane manufactured by The Boeing Company ("Boeing" or the "Company") crashed in October 2018, killing everyone onboard; a second one crashed in March 2019, to the same result. Those tragedies have led to numerous investigations and proceedings in multiple regulatory and judicial arenas to find out what went wrong and who is responsible. Those investigations have revealed that the 737 MAX tended to pitch up due to its engine placement; that a new software program designed to adjust the plane downward depended on a single faulty sensor and therefore activated too readily; and that the software program was insufficiently explained to pilots and regulators. In both crashes, the software directed the plane down.

The primary victims of the crashes are, of course, the deceased, their families, and their loved ones. While it may seem callous in the face of their losses, corporate law recognizes another set of victims: Boeing as an enterprise, and its stockholders. The crashes caused the Company and its investors to lose billions of dollars in value. Stockholders have come to this Court claiming Boeing's directors and officers failed them in overseeing mission-critical airplane safety to protect enterprise and stockholder value.

Because the crashes' second wave of harm affected Boeing as a company, the claim against its leadership belongs to the Company. In order for the stockholders to pursue the claim, they must plead with particularity that the board cannot be

1

entrusted with the claim because a majority of the directors may be liable for oversight failures. This is extremely difficult to do. The defendants have moved to dismiss this action, arguing the stockholders have failed to clear this high hurdle.

The narrow question before this Court today is whether Boeing's stockholders have alleged that a majority of the Company's directors face a substantial likelihood of liability for Boeing's losses. This may be based on the directors' complete failure to establish a reporting system for airplane safety, or on their turning a blind eye to a red flag representing airplane safety problems. I conclude the stockholders have pled both sources of board liability. The stockholders may pursue the Company's oversight claim against the board. But the stockholders have failed to allege the board is incapable of maintaining a claim against Boeing's officers. The stockholders' other claim against the board, regarding their handling of the chief executive officer's retirement and compensation, is also dismissed.

## I.    BACKGROUND

I draw the following facts from the Verified Amended Consolidated Complaint, as well as the documents attached and integral to it.[1]

---

[1] Docket Item ("D.I.") 131 [hereinafter "Am. Compl]. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Defs.' Ex. —" refer to the exhibits in support of Defendants' Motion, available at D.I. 147 through D.I. 152 and D.I. 160. Citations in the form of "Pls.' Ex. —" refer to exhibits in support of Plaintiffs' opposition to the Motion, available at D.I. 155. And citations in

2

Co-Lead Plaintiffs are Boeing stockholders. Co-Lead Plaintiff Thomas P. DiNapoli is Comptroller of the State of New York, Administrative Head of the New York State and Local Retirement System, and Trustee of the New York State

the form of "Hr'g Tr. —" refer to the transcript of the June 25, 2021 oral argument on Defendants' Motion, available at D.I. 169.

Prior to filing this action, Plaintiffs pursued and received books and records pursuant to 8 *Del. C.* § 220. Plaintiffs received over 44,100 documents totaling over 630,000 pages. It is reasonable to infer that exculpatory information not reflected in the document production does not exist. *See Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *24 & n.314 (Del. Ch. Aug. 24, 2020).

The Amended Complaint cites documents Plaintiffs obtained under Section 220. The parties do not contest that under the incorporation by reference doctrine, I may consider those documents and Defendants' exhibits in support of the Motion to determine whether the Amended Complaint has accurately referenced their contents in support of its claims and in pleading demand futility. *Reiter on Behalf of Cap. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *5–6 (Del. Ch. Oct. 18, 2016).

In briefing, Plaintiffs did not assert that any of the exhibits Defendants submitted would be improper to consider on the Motion. *See* D.I. 155 at 1 n.1 & 42–44. At argument, Plaintiffs' counsel suggested that the Court should not consider Dennis Muilenburg's "Lion Air Talking Points" for the Board's November 23, 2018 call, submitted as Defendants' Exhibit 86. *See* Hr'g Tr. 125–27. Specifically, Plaintiffs' counsel argued that "it is on its face a draft set of talking points that Mr. Muilenburg had"; and that "it's not incorporated by reference" because Plaintiffs "didn't plead that they were recited . . . to the board," "it's not a board meeting," and "[i]t's not a presentation," but "could have been." *Id.* 125. But Plaintiffs pled that "[t]alking points for the call circulated among Muilenburg and other executives expressed skepticism about media accounts of MCAS's role in the crash." Am. Compl. ¶ 224. Plaintiffs' brief in opposition to the Motion also relied on the talking points. *See* D.I. 155 at 26. Defendants submitted Exhibit 86 in reply. *See* Defs.' Ex. 86. I therefore consider Defendants' Exhibit 86 on the Motion.

At Defendants' urging, I have considered their proffered exhibits to determine if they show that Plaintiffs "misrepresented their contents" or if any inference that Plaintiffs seek is unreasonable. *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *8 (Del. Ch. Aug. 16, 2021) (citing *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020)). Through that lens, I find they do no such work for Defendants; in fact, Defendants' exhibits support Plaintiffs' allegations.

3

Common Retirement Fund ("NYSCRF"). NYSCRF is a public pension fund for New York State and local government employees. Co-Lead Plaintiff Fire and Police Pension Association of Colorado ("FPPA") is the Trustee for the Fire and Police Members' Benefit Investment Fund, which contains assets of governmental defined benefit pension plans for Colorado firefighters, police officers, and their beneficiaries. As of June 8, 2020, FPPA held approximately 9,165 shares of Boeing stock, and NYSCRF held approximately 1,186,627 shares of Boeing stock.

Nominal Defendant Boeing is a global aerospace corporation that designs, manufactures, and sells commercial airplanes and other aviation equipment for the airline, aerospace, and defense industries. Boeing conducts its business in four segments. Its Boeing Commercial Airplanes ("BCA" or "Commercial Airplanes") segment is by far the most lucrative, generating approximately 61.7% of the Company's revenue in 2017 and 45% of its revenue in 2019. That decrease resulted from two fatal crashes involving Boeing's 737 MAX airplanes in 2018 (the "Lion Air Crash") and 2019 (the "Ethiopian Airlines Crash"). Those tragedies caused preventable loss of life, as well as the grounding of Boeing's entire 737 MAX fleet in March 2019 (the "737 MAX Grounding") and attendant financial and reputational harm to the Company. Plaintiffs seek to hold the defendants in this action

accountable for those harms under the principles articulated in *In re Caremark International Inc. Derivative Litigation*[2] and *Marchand v. Barnhill*.[3]

The defendants are current and former Boeing officers (the "Officer Defendants") and members of Boing's Board of Directors (the "Board") (the "Director Defendants," and together with the Officer Defendants, "Defendants"), who allegedly failed to oversee and monitor airplane safety. The Director Defendants include Dennis A. Muilenburg, W. James McNerney Jr., Kenneth M. Duberstein, David L. Calhoun, Mike S. Zafirovski, Admiral Edmund P. Giambastiani Jr., Susan C. Schwab, Caroline B. Kennedy, Arthur D. Collins Jr., Edward M. Liddy, Ronald A. Williams, Lynn J. Good, Randall L. Stephenson, Robert A. Bradway, and Lawrence W. Kellner.[4]

Many of Boeing's Board seats were long-term and awarded to political insiders or executives with financial expertise. For example, Duberstein, the longest-tenured Defendant and a lobbyist with "ultimate insider status," served as a McDonnell Douglas director from 1989 to 1997, and then as a Boeing director from 1997 through April 2019, including as Lead Director from 2005 through April 2018.[5]

---

[2] 698 A.2d 959 (Del. Ch. 1996).

[3] 212 A.3d 805 (Del. 2019).

[4] Plaintiffs allege Defendant Raymond L. Conner was "vice chairman of Boeing" from 2014 to 2017. Am. Compl. ¶ 39. It is unclear whether Conner was vice chairman of the Board. If he was a director, he is included as a "Director Defendant."

[5] Am. Compl. ¶ 23.

5

Duberstein was succeeded in that role by Defendant David L. Calhoun, a private equity executive, who has been a Boeing director since 2009; was appointed Board Chairman in October 2019 in the wake of the 737 MAX crashes; and was appointed Boeing's President and CEO in January 2020.

The Officer Defendants have also had extensive tenures at Boeing. They include the following:

- McNerney has been with Boeing since at least 2001. He served as Boeing's CEO, President, and Chairman of the Board from 2005 until February 2016.

- Muilenburg is a career Boeing executive who started with the Company in 1985. He became Boeing's Vice Chairman, President, and COO in December 2013; CEO in July 2015; and CEO and Chairman of the Board in March 2016, succeeding McNerney. After the 737 MAX crashes, in October 2019, Muilenburg was removed as Chairman and ultimately retired from the Company in December 2019.

- Defendant J. Michael Luttig served as Boeing's EVP and General Counsel from May 2006 to May 2019. In May 2019, following the grounding of the 737 MAX, Luttig was named Counselor and Senior Advisor to CEO Muilenburg and the Board, but left the Company in December 2019.

- Defendant Raymond L. Conner joined Boeing in 1977.  He served as Boeing's Vice Chairman from 2014 until his retirement in 2017, and President and CEO of BCA from 2014 until November 2016.

- Defendant Kevin G. McAllister was Boeing's Executive Vice President and President and CEO of BCA from November 2016 (succeeding Conner) until his ouster in October 2019, following the Ethiopian Airlines Crash.

- Defendant Greg Hyslop has been Boeing's chief engineer since July 2016, overseeing all aspects of safety and technical integrity of Boeing products and services.  Hyslop is also a member of Boeing's Executive Council and reports to the Company's President and CEO.

- Defendant Diana L. Sands is a member of Boeing's Executive Council and has served as Senior Vice President of Boeing's Office of Internal Governance and Administration since April 2014.  As Boeing's chief ethics and compliance officer, she leads Boeing's ethics, compliance, corporate audit and trade controls activities, and reports to Boeing's President and CEO and to Boeing's Audit Committee, discussed *infra*.

- Defendant Greg Smith has served as Boeing's CFO since 2011.

In these roles, Defendants allegedly failed to carry out their respective duties to monitor the safety and airworthiness of Boeing's aircraft, and the extent of those

alleged failures only surfaced in the wake of corporate trauma. Rather than prioritizing safety, Defendants lent their oversight authority to Boeing's agenda of rapid production and profit maximization. That misplaced Board focus caused Boeing to bleed millions of dollars in fees, fines, and lost revenue, yet the Company rewarded several of the Defendants with hefty compensation and retirement packages.

### A. Boeing Shifts Its Focus From Engineering And Safety To Profits And Rapid Production.

Founded in 1916, Boeing thrived as "an association of engineers."[6] Its executives were "conversant in engineering requirements."[7] As a result, Boeing's culture emphasized engineering and safety, and Boeing emerged as a leading global aerospace manufacturer.

As the Company grew, its focus on safety and engineering fell away. In 1997, Boeing acquired McDonnell Douglas, another airplane manufacturer with a long history of pushing profits, shirking quality control, and designing products involved in numerous safety incidents. With former McDonnell Douglas leaders at the helm, Boeing's corporate culture shifted from "safety to profits-first" and "focusing on

---

[6] Am. Compl. ¶ 44.

[7] *Id.*

8

costs-cutting rather than designing airplanes."[8]  As observed by a longtime Boeing physicist:

> If your business model emphasizes productivity, employee engagement, and process improvement, costs go down faster.  This was the essence of the "quality" business model Boeing followed in the mid-90s.
>
> The 777 had the best "learning curve" in the business.  On the other hand, if your industry is mature, and your products are commodity-like, business school theory says a cost-cutting model is appropriate.
>
> Wal-Mart perfected its particular version of the cost-cutting business model.  Amazon adapted that model to its industry.  Boeing has adapted it to high-end manufacturing.[9]

As a result, many of Boeing's engineers felt disenchanted, and in 2000 they staged a forty-day strike to improve Company culture and regain a voice in decision making.  By 2001, Boeing relocated its headquarters from Seattle to Chicago in order "to escape the influence of the resident flight engineers."[10]

The internal shift to focus on cost-cutting exacerbated the inherent risks associated with Boeing's business.  In the early 2000s, Boeing saw a sharp rise in safety violations imposed by the Federal Aviation Administration (the "FAA").

---

[8] *Id.* ¶ 47.

[9] *Id.* ¶ 55 (quoting Stan Sorscher, a longtime Boeing physicist and negotiator for the Society for Professional Engineering Employees in Aerospace).

[10] *Id.* ¶ 5; *see also id.* ¶ 50.  As Boeing's then-CEO Phil Condit explained, "When the headquarters is located in proximity to a principal business—as ours was in Seattle—the corporate center is inevitably drawn into day-to-day business operations." *Id.*

9

Between 2000 and 2020, the FAA flagged twenty airplane safety violations for poor quality control, poor maintenance, and noncompliant parts, as well as the Company's failure to provide its airline clients with crucial safety information.[11]  Consequently, Boeing faced fines ranging between $6,000 and $13 million.

Quality suffered, and the Company was widely criticized, with prosecutors asking, "Where was the leadership?"[12]  Management scandals ultimately led to the ouster of two successive CEOs.  Then, in 2005, McNerney was named CEO. McNerney did not have a technical background, and after his appointment, Boeing was described as a "weird combination of a distant building with a few hundred people in it and a non-engineer with no technical skills whatsoever at the helm."[13]

The Company's safety record in the years that followed was spotty.  In 2013, the new 787 Dreamliner suffered a series of lithium-ion battery fires and was grounded by the FAA.  In 2014, the National Transportation Safety Board ("NTSB") directed Boeing to modify its process for developing safety assessments for designs incorporating new technology, after having determined that (1) Boeing had made misleading and unfounded claims about the lithium-ion battery system in its safety assessment reports to the FAA; (2) Boeing's certification engineers had not properly

---

[11] *See id.* ¶ 49.  In comparison, the FAA cited Boeing's competitor, Airbus, for only three safety violations during the same period.  *Id*.

[12] *Id.* ¶ 52.

[13] *Id.* ¶ 53.

tested the lithium-ion battery system; and (3) Boeing's safety assessment was insufficient. *Al Jazeera* also conducted and released an investigative report that detailed employee reports of ineffective quality control at a Dreamliner plant that resulted in "foreign object debris" being left in the aircraft, and disclosed that a Boeing customer was refusing to accept Dreamliners manufactured in that plant due to quality concerns.[14]

In addition to the Dreamliner issues, in July 2013, one of Boeing's 777 airplanes crashed, killing three and seriously injuring dozens. An NTSB report concluded that the crash was caused, at least in part, by inadequate plane documentation and training manuals, and recommended improvements in those areas.

Boeing's safety woes continued into 2015 as reflected in thirteen separate pending or potential civil enforcement cases relating to quality control, safety protocol violations, and manufacturing errors in production lines. The FAA investigated these claims and Boeing's failure to take appropriate corrective actions. In December 2015, Boeing entered into an unprecedented settlement with the FAA (the "FAA Settlement") and agreed to pay historic fines of $12 million, with up to $24 million in additional fines deferred pending Boeing acting on a five-year implementation of "additional significant systemic initiatives, to strengthen its

---

[14] *Id.* ¶¶ 118–21.

regulatory compliance processes and practices."[15] On February 25, 2021, the FAA announced in a press release it had assessed an additional $6.6 million in deferred civil penalties and settlement costs against Boeing.[16]

## B. Boeing Lacked Any Formal, Board-Level Process To Oversee Airplane Safety.

Boeing did not implement or prioritize safety oversight at the highest level of the corporate pyramid. None of Boeing's Board committees were specifically tasked with overseeing airplane safety, and every committee charter was silent as to airplane safety. The Board recognized as much: former director John H. Briggs, who retired in 2011, observed that the "board doesn't have any tools to oversee" safety.[17] This stood in contrast to many other companies in the aviation space whose business relies on the safety and flightworthiness of airplanes.[18]

From 2011 until August 2019, the Board had five standing Committees to monitor and oversee specific aspects of the Company's business: (1) Audit, (2) Finance, (3) Compensation, (4) Special Programs, and (5) Governance, Organization and Nominating. The Audit Committee was Boeing's primary arbiter for risk and compliance. Specifically, it "evaluat[ed] overall risk assessment and

---

[15] *Id.* ¶ 123.

[16] Pls.' Ex 1.

[17] Am. Compl. ¶ 57.

[18] *Id.* ¶ 67 (identifying board-level safety committees and control at Southwest Airlines, Delta Airlines, United Airlines, JetBlue, Spirit Airlines, and Alaska Airlines).

risk management practices"; "perform[ed a] central oversight role with respect to financial statement, disclosure, and compliance risks"; and "receiv[ed] regular reports from [Boeing's] Senior Vice President, Office of Internal Governance and Administration with respect to compliance with our ethics and risk management policies."[19]

The Audit Committee's charter identifies its responsibilities as

- "[o]btain[ing] and review[ing], on an annual basis, a formal written report prepared by the independent auditor describing [Boeing's] internal quality-control procedures";

- reviewing "[a]ny material issues raised by the most recent internal quality-control review, or peer review, of [Boeing], or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by [Boeing]";

- "[d]iscuss[ing] with management the Company's policies, practices and guidelines with respect to risk assessment and risk management";

- "[a]t least annually receiv[ing] reporting by the [Senior Vice President, Office of Internal Governance and Administration] on the Company's

---

[19] *Id.* ¶ 59.

13

compliance with its risk management processes, and by the General Counsel on pending Law Department investigations of alleged or potentially significant violations of laws, regulations, or Company policies"; and

- "[m]eet[ing] with the [Senior Vice President, Office of Internal Governance and Administration] to review the Company's ethics and business conduct programs and the Company's compliance with related laws and regulations."[20]

The Audit Committee was obligated to regularly report to the Board regarding those topics, including "the Company's compliance with legal or regulatory requirements," and "the implementation and effectiveness of the Company's ethics and compliance programs to support the Board's oversight responsibility."[21]

Although the Audit Committee was tasked with handling risk generally, it did not take on airplane safety specifically. Its yearly updates regarding the Company's compliance risk management process did not address airplane safety. For example, when the Board discussed audit plans in 2014 and 2017, respectively, it did not mention or address airplane safety. Specifically as to the 737 MAX, from its development through its grounding in 2019, the Audit Committee never mentioned

---

[20] *Id.* ¶ 61.

[21] *Id.* ¶ 62.

"safety." [22]   Nor did it address product safety issues related to the design, development, or production of the 737 MAX, or ask for presentations on the topic.

Rather, consistent with Boeing's emphasis on rapid production and revenue, the Audit Committee primarily focused on financial risks to the Company.  For example, its February 2011 audit plan focused on "production rate readiness activities" and "supplier management rate readiness."[23]  Its presentations centered on whether Boeing had liquidity, capital, and supply chain resources sufficient to fund aggressive production of the 737 MAX.[24]  Even after the Lion Air Crash in 2018, chief compliance officer Sands's risk management update to the Audit Committee in December 2018 did not identify product safety as a "compliance risk" for 2018.[25]

The Audit Committee also oversaw an Enterprise Risk Visibility ("ERV") process.[26]  The ERV process annually provided senior management and the Board with a "comprehensive view of key Boeing Risks and the actions taken to address them," as curated from "[a]ll business units, major functions, and risk and

---

[22] *Id.* ¶¶ 60, 62–64.

[23] *Id.* ¶ 64.

[24] *See* Defs.' Ex. 6; Defs.' Ex. 10; Am. Compl. ¶¶ 60, 63; *see also infra* note 32.

[25] Am. Compl. ¶ 65.

[26] Defs.' Ex. 7 at -14500; Hr'g Tr. 9.

compliance disciplines."[27]   The Audit Committee annually reviewed the top strategic, operational, and compliance risks the ERV process identified, and subsequently reported those risks to the Board, which in turn reviewed management's mitigation of those risks.[28]   The ERV process also played an important role in Boeing's internal Corporate Audit group, which evaluated priority risk areas within the Company.[29]   Based on the results of annual ERV risk assessments, the Corporate Audit group annually submitted an audit plan to review top risks.[30]   But neither the Corporate Audit group nor the ERV process specifically emphasized airplane safety; they primarily focused on production and financial risks.[31]

Airplane safety was not a regular set agenda item or topic at Board meetings. Audit Committee and ERV materials reveal that airplane safety risks were not discussed.[32]   While the Board sometimes discussed production line safety, the Board

---

[27] Defs.' Ex. 7 at -14501.

[28] *Id.* at -14502–04.

[29] Defs.' Ex. 9 at -14488; Defs.' Ex. 10 at -17591; Hr'g Tr. 9.

[30] Defs.' Ex. 9 at -14488–89.

[31] *See* Defs.' Ex. 7; Defs.' Ex. 8 at -11183–84; Defs.' Ex. 9; Defs.' Ex. 10 at -17575–92; Defs.' Ex. 23; Defs.' Ex. 24 at -16424, -16426; Defs.' Ex. 25 at -16997; *see also infra* note 32.

[32] Defs.' Ex. 6; Defs.' Ex. 7 at -14501–04; Defs.' Ex. 9 at -14489–90, -14495; Defs.' Ex. 10; Defs.' Ex. 13; Defs.' Ex. 23; Defs.' Ex. 24 at -16424, -16426; Defs.' Ex. 25 at -16981; *see also* Am. Compl. ¶¶ 64–66.  Discussions or mentions of "safety" are similarly absent from the Audit Committee Report and Enterprise Risk Visibility Review sections of the Board meeting minutes Defendants submitted.  Ex. 8 at -11183–84, -11187; Defs.' Ex. 11

often met without mentioning or discussing safety at all.[33] The Board did hear presentations discussing "Environment, Health & Safety,"[34] including regarding the workplace safety program "Go4Zero."[35] Communications mentioning "safety," "quality," or "risk" do not reflect substantive discussion related to airplane safety.[36]

at -12506; Defs.' Ex. 12 at -12648–49; Defs.' Ex. 19 at -11606; Defs.' Ex. 26 at -13570, -13573; Defs.' Ex. 27 at -11921–23; Defs.' Ex. 28; Defs.' Ex. 29; Defs.' Ex. 34 at -12382–83; Defs.' Ex. 37 at -12972; Defs.' Ex. 39 at -8135; Defs.' Ex. 44; *see also* Am. Compl. ¶ 64. Defendants' Exhibits 28, 29, 39, and 44 were largely redacted in Defendants' Section 220 production.

[33] Defs.' Ex. 11; Defs.' Ex. 12; Defs.' Ex. 18; Defs.' Ex. 37; Defs.' Ex. 38; Defs.' Ex. 40; Defs.' Ex. 42; Defs.' Ex. 43; Defs.' Ex. 44; Defs.' Ex. 46; Defs.' Ex. 50; Defs.' Ex. 51; Defs.' Ex. 52. These documents do not support Defendants' argument that the Board had a reporting structure and processes to oversee airplane safety and the 737 MAX. *See* Hr'g Tr. 8.

[34] *See, e.g.*, Defs.' Ex. 9 at -14495 (listing "safety" within "Environment, Health & Safety" in the Appendix D Risk Universe); Defs.' Ex. 10 at -17589 ("Supply Chain Operations (SCO) Environment, Health & Safety, Safety Management System Renton 737 Programs Governance" and "Evaluate processes for Renton site safety oversight related to 'Go for Zero' execution to achieve overall relevant Enterprise Safety objectives"); *see also* Defs.' Ex. 7; Defs.' Ex. 10 at -17572–73, -17583, -17587; Defs.' Ex. 20 at -13047, -13066; Defs.' Ex. 23 at -15866; Defs.' Ex. 24 at -16426; Defs.' Ex. 25 at -16981; Defs.' Ex. 84 at -618225, -618235, -618240, -618242, -618248.

[35] *See, e.g.*, Defs.' Ex. 19 at -11603 ("Mr. Shanahan then provided a Safety Update. He began by reviewing the evolution of the 'Go for Zero' safety program since 2007. He next reviewed safety performance and workplace injury statistics for operations and non-operations activities. Mr. Shanahan then reviewed safety focus areas, including improvements in final assembly and structures manufacturing, ongoing prevention activities and the roles of data analytics in improving safety performance."); *see also* Defs.' Ex. 10 at -17589; Defs.' Ex. 16 at -11076; -11078; Defs.' Ex. 17 at -11646.

[36] Defs.' Ex. 6 at -20519; Defs.; Ex. 8 at -11183; Defs.' Ex. 16 at -11073, -11077–80; Defs.' Ex. 17 at -11646; Defs.' Ex. 20 at -13057; Defs.' Ex. 21 at -2692; Defs.' Ex. 22 at -18837–38 ("Model-Based Engineering (MBE) – Progress . . . Improve safety, quality, productivity, cost"); Defs.' Ex. 25 at -16997; Defs.' Ex. 37 at -12967; Defs.' Ex. 39 at -8133, -8135; Defs.' Ex. 40 at -8086; Defs.' Ex. 41 at -8315; Defs.' Ex. 42 at -12481; Defs.' Ex. 43 at -12842; Defs.' Ex. 44 at -2501; Defs.' Ex. 45 at -1960; Defs.' Ex. 50 at -2711;

Management's periodic reports to the Board did not include safety information. Muilenburg sent the Board a monthly business summary and competitor dashboard, and management made occasional presentations at Board meetings.[37] Those management communications focused primarily on the business impact of airplane safety crises and risks.[38]

Further, the Board did not have a means of receiving internal complaints about airplane safety. Before 2019, Boeing's principal internal safety reporting process was the Safety Review Board ("SRB"). The SRB was Boeing's principal internal safety reporting process, but it had no link to the Board and no Board reporting mechanism.[39] The SRB operated below the level of the most senior officers; the complaints and concerns fielded by the SRB were handled by Boeing's mid-level management like the Program Functional Chief Design Engineer, the Chief Pilot, the Chief Project Engineer, and the Product Safety Chief Engineer and factory leaders. Without a Board-level reporting mechanism, safety issues and whistleblower complaints reported to the SRB did not come to the Board's attention.

---

Defs.' Ex. 52 at -11401; Defs.' Ex. 62 at -13680–81; Defs.' Ex. 63 at -13682; Defs.' Ex. 70 at -13684.

[37] *See, e.g.*, Defs.' Ex. 62.

[38] Am. Compl. ¶¶ 7, 8, 14, 17, 18, 57–76; *see* Defs.' Ex. 60 at -13677; Defs.' Ex. 73 at -2944; Defs.' Ex. 74 at -2947; *see also supra* notes 34-36 and accompanying text.

[39] Hr'g Tr. 30–33; Am. Compl. ¶¶ 74–76.

Neither the Audit Committee, nor any other Board committee, reviewed whistleblower complaints related to product safety.

### C. Boeing Develops The 737 MAX In An Effort To Outpace Its Competitors.

With the Board so distanced from safety information, and on the heels of recent safety incidents and inquiries, Boeing continued to push production and forego implementing meaningful systems to monitor airplane safety. Boeing's primary production focus was on its "blockbuster" 737 MAX, which became one of the Company's key revenue sources.[40]

By 2008, Boeing was falling behind on production and sales as compared to its primary competitor, Airbus. In 2010, Airbus announced its fuel-efficient A320neo, which sold well and quickly gained ground on Boeing's 737, which had not been updated since the late 1990s. As Boeing clients began considering Airbus's fuel-efficient jets, Boeing felt production and sales pressure.

In 2010 and early 2011, Boeing considered two options for updating its existing 737 Next Generation ("737 NG") model: either develop an entirely new airplane, which could take a decade, or redesign the current model with larger, more efficient engines in six years. In an effort to regain competitive ground, and amid concerns about production cost and timing, Boeing elected to update the 737 NG. If

---

[40] *See* Am. Compl. ¶ 6.

developed as a "derivative plane," Boeing would only need to secure FAA certification for those changes between the 737 NG and the new plane.[41] The FAA assesses the minimum level of "differences training" required for a pilot to fly a new airplane by evaluating the similarity between the new and prior versions of the airplane.[42]

At a June 2011 Board meeting, the Board and senior management considered the potential redesign of the 737 NG. Jim Albaugh, Head of BCA, pressed the production and sales benefits of the 737 NG's potential "re-engine": gains in fuel efficiency, non-recurring investment costs, capital costs, and expedited re-design schedules.[43] The Board concluded the reconfigured airplane would have larger and more fuel-efficient engines intended to "restore[] competitive advantage over [Airbus's] NEO."[44]

So at an August 2011 Board meeting, the Board approved development of Boeing's next generation of narrow-body commercial aircraft: the 737 MAX, which would be a reconfigured version of the 737 NG that "incorporat[ed] new engine technology and such other modifications and upgrades as are deemed appropriate in

---

[41] *Id.* ¶ 138.

[42] *Id.* ¶ 163.

[43] *Id.* ¶ 133.

[44] *Id.*

light of prevailing market conditions."[45]  The August 2011 Board minutes describe the "strategy and objectives associated with a re-designed 737 airplane, including increasing customer value, maintaining market share and a competitive advantage over the Airbus 320neo, reducing risk and enabling wide body product investment."[46]  According to three people present at the August Board meeting, no Board member asked about the safety implications of reconfiguring the 737 NG with larger engines.  Rather, the Board inquired about engine options, program personnel, development schedule contingencies, and customer contract provisions regarding performance and penalties; the Board's primary concern was "how quickly and inexpensively the Company could develop the 737 MAX model to compete with Airbus's A320neo."[47]  The Board delegated to McNerney all authority over the multi-year effort to approve the 737 MAX's final specifications, and deliver and build it, without having to return to the Board.

### 1. Boeing Implements The "MCAS" System In The 737 MAX.

In developing and marketing the 737 MAX, Boeing prioritized (1) expediting regulatory approval and (2) limiting expensive pilot training required to fly the new model.  As explained by a former Boeing engineer who worked on the 737 MAX's

---

[45] *Id.* ¶ 135; *see id.* ¶¶ 6, 133–34.

[46] *Id.* ¶ 267.

[47] *Id.* ¶ 134.

flight controls, Boeing "wanted to A, save money and B, to minimize the certification and flight-test costs."[48]

Because the Company was months behind Airbus in developing a new airplane, Boeing set a "frenetic" pace for the 737 MAX program, resulting in hastily delivered technical drawings and sloppy, deficient blueprints.[49] Boeing's engineers were instructed to maintain "commonality" with the 737 NG in order to expedite FAA certification.[50] But maintaining commonality posed unique design issues.

In particular, the 737 MAX's larger engine needed to be situated differently on the airplane's wings, shifting its center of gravity. Because of that engine placement, the 737 MAX tended to tilt too far upwards, or "pitch up," in flight.[51] Initial attempts to resolve the issue with aerodynamic solutions failed. So Boeing addressed the issue with new software: the Maneuvering Characteristics Augmentation System, or "MCAS."[52] MCAS moved the leading edge of the plane's entire horizontal tail, known as the "horizontal stabilizer," to push the airplane's tail up and its nose down.[53]

---

[48] *Id.* ¶ 138.

[49] *Id.* ¶ 137.

[50] *Id.* ¶ 138 (explaining that "commonality" is "an industry term that evaluates how similar one model is to its predecessor").

[51] *Id.* ¶ 150.

[52] *Id.* ¶¶ 9, 152–53, 155.

[53] *Id.* ¶ 152.

As originally designed, MCAS would activate only if the plane pitched up at both a high angle of attack (or "AOA") and a high G-force (the plane's acceleration in a vertical direction). During 2016 flight testing, Boeing changed MCAS to allow it to activate at low speeds; as such, it "could be automatically triggered simply by a high AOA."[54]

The external sensor for AOA was highly vulnerable to false readings or failure for numerous reasons, such as general weather, lightning, freezing temperatures, software malfunctions, or birds. The AOA's sensor's vulnerability was well-known: between 2004 and 2019, failed AOA sensors were flagged to the FAA in more than 216 incident reports, including instances that required emergency landings. MCAS had only one AOA sensor, creating a "single point of failure" that violated the fundamental engineering principle requiring redundancy "so that one single error in a complex system does not cause total system failure."[55] If the single AOA sensor was triggered, even for a flawed reason unrelated to the plane's pitch, MCAS would "correct" the aircraft by pushing its nose down.[56]

---

[54] *Id.* ¶ 155.

[55] *Id.* ¶¶ 159–60. A 2011 FAA Advisory Circular warned that "[h]azards identified and found to result from probable failures are not acceptable in multiengine airplanes," and that "[i]n these situations, a design change may be required . . . such as increasing redundancy." *Id.* ¶ 159.

[56] *Id.* ¶ 190 ("[A]n analysis performed by the manufacturer showing that if an erroneously high single [AOA] sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer.").

In 2013, Boeing engineers proposed that the 737 MAX implement a Dreamliner safety feature called "synthetic airspeed" to detect a false AOA signal.[57] Managers rejected that proposal due to additional cost and pilot training, and MCAS remained dependent on a single fickle AOA sensor. Engineers remained skeptical; in late 2015, one queried: "[a]re we vulnerable to single AOA sensor failures with the MCAS implementation or is there some checking that occurs?"[58]

Boeing's analyses and FAA disclosures about MCAS underestimated its lethality. In 2014, Boeing submitted a System Safety Assessment (an "Assessment") to the FAA calculating the effect of possible MCAS failures. The Assessment did not consider the possibility that MCAS could trigger repeatedly, effectively giving the software unlimited authority over the plane. Boeing concluded MCAS was not a "safety-critical system."[59] After MCAS was revised to rely on the single AOA sensor, internal safety analyses concluded that MCAS could cause "catastrophic" failures if it took a pilot more than ten seconds to identify and respond to the software's activation.[60] But the analyses assumed the pilot would react within four seconds, and so concluded that the likelihood of a "hazardous event" due to an

---

[57] *Id.* ¶ 161.

[58] *Id.* ¶ 160.

[59] *Id.* ¶ 154.

[60] *Id.* ¶ 156.

24

MCAS failure was nearly inconceivable.[61]  It would later be revealed that Boeing's four-second reaction time assumption was a "gross underestimate."[62]

Boeing did not update the 2014 FAA Assessment for MCAS as revised. Boeing's technical pilots deceived the FAA by failing to disclose that MCAS as revised activated only upon the AOA sensor signal, regardless of speed, increasing the likelihood that MCAS would activate.

### 2. Boeing Pushes Expedited Certification And Rapid Production.

Based on purported commonality with the 737 NG, Boeing sought "Level B" pilot training for the 737 MAX, which can be done on a tablet computer without costly flight simulator training.[63]  More extensive training would incur additional costs, defeat the economies from commonality with the 737 NG, and make the 737 MAX less competitive with the Airbus 320neo.  Between 2014 and 2017, Boeing touted that flight simulator training would not be necessary on the 737 MAX.

Boeing and its well-connected leadership had significant sway over the FAA, and the FAA often permitted Boeing to self-regulate.  Boeing put "tremendous

---

[61] *Id.*

[62] *Id.*

[63] *Id.* ¶ 164.

pressure" on its Chief Technical Pilot Mark Forkner to obtain Level B pilot training for the 737 MAX.[64]

In August 2016, the FAA issued a provisional report establishing Level B training for the 737 MAX. In November, after Boeing had revised MCAS, Forkner texted a colleague that MCAS was "running rampant" on a flight simulator when operating at a low speed and then texted: "so basically I lied to the regulators (unknowingly)."[65] Still, Forkner stressed to the FAA that it should not reference MCAS in its report because it was "outside the normal operating envelop[e]."[66]

In July 2017, the FAA published the final 737 MAX report providing for Level B differences training determination. Based on Boeing's failure to submit a new Assessment on the revised MCAS and misrepresentation of MCAS's safety risks, the FAA deleted all information about MCAS from the July 2017 report.[67] Forkner emailed a Boeing colleague bragging that his "jedi mind tricks" had worked on the FAA.[68]

---

[64] *Id.* ¶ 105.

[65] *Id.* ¶ 169; *see id.* Ex. A; *id.* Ex. B at A-10.

[66] *Id.* ¶ 170 ("[O]ne of the Program Directives we were given was to not create any differences . . . That is what we sold to the regulators who have already granted us the Level B differences determination. *To go back to them now, and tell them there is in fact a difference . . . would be a huge threat to that differences training determination.*").

[67] *Id.* ¶ 106; *id.* Ex. B.

[68] *Id.* ¶ 171.

As a result of the FAA's decision, the 737 MAX airplane manuals and pilot training materials for U.S.-based airlines lacked specific information about MCAS.[69] Specifically, no substantive description of MCAS appeared in Boeing's three documents for pilots flying new models: (1) the Flight Crew Operations Manual ("FCOM"), the primary pilot reference; (2) the Quick Reference Handbook, a shorter emergency manual for abnormal flight situations; and (3) the Flight Crew Training Manual, which provides general recommendations on flying maneuvers and techniques. After the Lion Air and Ethiopian Airlines Crashes, senior FAA officials testified before Congress that MCAS should have been explained in those manuals.

After securing Level B training, Boeing continued to conceal issues with the 737 MAX. The airplane was supposed to have an "AOA disagree alert" to identify malfunction in the airplane's AOA sensor and prevent it from triggering MCAS's "repeated nose-down trim commands of the horizontal stabilizer."[70] That alert was a standard feature of the 737 NG.[71] Boeing included the alert in the March 2017 "type certificate" submitted to the FAA, so the alert was required in all planes produced.[72] But in August 2017, Boeing learned the alert did not function due to a

---

[69] *Id.* ¶¶ 106, 173; *id.* Ex. B.

[70] *Id.* ¶¶ 175, 190.

[71] *Id.* ¶ 175.

[72] *Id.* ¶ 177.

software issue; to make it work, customers needed to purchase an optional "add-on" feature for $80,000 called an "AOA indicator display."[73] The AOA disagree alerts did not work in at least 80% of the 737 MAX planes Boeing delivered—including the Lion Air and Ethiopian Airlines planes that crashed. Boeing did not tell the FAA or its customers that the majority of its planes had inoperable AOA disagree alerts until after the Lion Air Crash in 2018. And even after the 2019 Ethiopian Airlines Crash, Boeing continued to insist that the AOA indicator display was not a "required" safety feature and that it was appropriate to offer it as an optional "add on."[74] Boeing decided to repair the AOA disagree alert via a software update that was not scheduled to roll out until 2020.

3. **Boeing Successfully Markets The 737 MAX In Emerging Markets And Presses The Board's Business Objectives; Boeing's Employees Question The 737 MAX's Safety, But Those Concerns Never Reach The Board.**

Four months after announcing the 737 MAX in 2011, Boeing had logged more than 1,000 orders and commitments for the airplane from airlines and leasing customers worldwide. By 2014, Boeing had over 2,700 737 MAX orders from fifty-seven customers. And by the end of 2016, Boeing had 4,300 orders from ninety-two

---

[73] *Id.* ¶ 176.

[74] *Id.* ¶ 180.

customers. The 737 MAX had become the fastest-selling airplane in Boeing's history.

Many of those sales originated from Boeing's target customers in emerging markets. Boeing pursued those customers in a cost-saving and revenue-enhancing strategy, knowing that in many countries with expanding fleets of low-cost airlines, the quality of pilot training was not consistently as high as in the United States. Those countries took their safety cues from the FAA. Although Lion Air and Garuda Indonesia Airlines both initially requested simulator training on their newly purchased 737 MAX airplanes, Boeing pressed that computer-based training was sufficient.[75] Boeing never required or provided simulator training. By December 2017, Boeing had sold numerous 737 MAX airplanes to airlines in Southeast Asia, including Lion Air.

Boeing began fulfilling customer orders in May 2017.[76] By 2018, Boeing's profits from the 737 MAX skyrocketed.[77] The BCA accounted for approximately 60% of the Company's record $101.1 billion in annual revenue and approximately

---

[75] *Id.* ¶ 143 (explaining that "rather than provide costly simulator training, Boeing employees emphasized that the 'FAA, [European regulators], Transport Canada, China, Malaysia, and Argentinia [*sic*] authorities have all accepted the [computer-based training] requirement'").

[76] *Id.* ¶ 144.

[77] *Id.* ¶ 146.

$8 billion, or 80%, of the Company's annual net earnings.[78] By the end of 2018, the value of Boeing's total backlog of orders—a measure of financial health for an airplane manufacturer—had risen to $490 billion, with the BCA accounting for $412 billion and nearly 5,900 jetliners, more than 4,000 of which were 737 MAX airplanes.

Boeing struggled to keep up with demand and customer expectations and to meet the Board's production and delivery target of fifty-seven airplanes per month. In July and August 2018, deliveries averaged approximately thirty-nine airplanes per month. Falling behind, Boeing employees worked in a "factory in chaos," facing intense pressure to maintain production schedules.[79]

As Boeing's 737 MAX's sales accelerated, its employees grew concerned about the airplane's safety. For example, in summer 2018, a longtime general manager and engineer at the 737 MAX plant in Renton, Washington, tried to raise "Recovery Operations & Safety Concerns" with the 737 program's general manager and factory leader, writing, "[R]ight now all my internal warning bells are going off. . . . And for the first time in my life, I'm sorry to say that I'm hesitant about putting my family on a Boeing airplane."[80] At a meeting, the engineer expressed

---

[78] *Id.*

[79] *Id.* ¶ 148.

[80] *Id.* ¶ 87.

that he had "seen larger operations shut down for far less safety issues . . . in the military and those organizations have national security responsibilities."[81]  The manager responded, "The military isn't a profit making organization."[82]  The engineer retired from Boeing soon thereafter.  Before and after the Lion Air Crash, similar concerns came in from other employees regarding unrelenting and dangerous economic pressure from senior management to produce the 737 MAX rapidly and cheaply.[83]

---

[81] *Id.* ¶ 89.

[82] *Id.*

[83] *See id.* ¶ 90 ("Separately, in 2018, . . . a Boeing engineering manager working on the 737 MAX, expressed frustration to Director of Global Operations . . . that Boeing had selected 'the lowest cost supplier and sign[ed] up to impossible schedules,' which reflected unrelenting and dangerous economic pressure from senior management:  [']*I don't know how to fix these things* . . . it's systemic.  It's culture.  It's the fact that we have a senior leadership team that understand very little about the business and yet are driving us to certain objectives. . . . *Sometimes you just have to let things fail big so that everyone can identify a problem* . . . maybe that's what needs to happen rather than just continuing to scrape by.[']"); *id.* ¶ 91 ("In July 2018, Boeing's Test and Evaluation department voiced concerns to 'Boeing Executive Leadership' regarding the 'considerable pressure' the 737 MAX program faced over production schedules.  The department's letter identifies the 'ero[sion of] safety margins' due to the declining average experience among senior production pilots.   [Boeing's]  Employee  Relations  Director . . . forwarded  the communication to defendant Hyslop, Boeing's chief engineer, but . . . mischaracterized the letter as seeking mainly compensation and additional benefits, without flagging the safety concerns of overworked employees."); *id.* ¶ 92 ("[I]n November 2018, after the Lion Air Crash, . . . a Quality Assurance Inspector and nearly 30-year Boeing veteran, recounted mistreatment 'for reporting serious quality problems,' explaining that '[n]o one should have to go through this when trying to do what is right – to assure the quality of our product.'  He added, 'I have stood alone during these past months trying to assure that we have addressed these quality issues.  I had only hoped that management would have stood with me.'  [The employee] identified another whistleblower . . . a former quality specialist and compliance monitor, whom he said was also harassed in retaliation for reporting of 'quality concerns' related to the 737 MAX.").

While some of these complaints made their way to senior management, none made it to the Board. The Board was unaware of whistleblower complaints regarding airplane safety, compliance, workforce exhaustion, and production schedule pressure at the 737 MAX facility.

**D. Undisclosed Issues With The 737 MAX Ultimately Cause The Lion Air and Ethiopian Airlines Crashes; The Board Continues To Shirk Safety Oversight, Receiving Only Sporadic Updates About The 737 MAX From Management.**

On October 29, 2018, a new 737 MAX flying as Lion Air Flight 610 crashed in the Java Sea minutes after taking off from Jakarta, Indonesia, killing all 189 passengers and crew. Satellite data show the plane rising and falling repeatedly, as MCAS continually activated to force the airplane's nose downwards. The plane's black box data revealed that the pilots searched the Quick Reference Handbook's checklist for abnormal flight events, but it said nothing about MCAS, which was later identified as the cause of the tragedy. Within days of recovering the black box, Boeing started revising MCAS.

The FAA quickly conducted a risk assessment analysis and concluded what many at Boeing already knew: that there was an unacceptably high risk of catastrophic failure if MCAS was not changed, estimating that the then-existing fleet of Boeing 737 MAX planes would average one fatal crash stemming from MCAS every two to three years if the software was not corrected. Boeing then conducted its own risk assessment and reached a conclusion consistent with the FAA's. On

32

November 6, Boeing issued an Operations Manual Bulletin to the airlines (the "Manual Bulletin"), stating, "[i]n the event of erroneous AOA sensor data, the pitch trim system can trim the stabilizer nose down in increments lasting up to 10 seconds."[84] It did not name MCAS.

The next day, November 7, the FAA issued an Emergency Airworthiness Directive (the "Emergency Directive"), indicating that "an unsafe condition exists that requires immediate action by an owner/operator."[85] The Emergency Directive described "an analysis performed by the manufacturer showing that if an erroneously high single [AOA] sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer."[86] The FAA mandated that Boeing revise its flight manuals "to provide the flight crew horizontal stabilizer trim procedures to follow under certain conditions."[87] In response, Muilenburg emailed Greg Smith warning the mandate might harm productivity: "[w]e need to be careful that the [airplane flight manual] doesn't turn into a compliance item that restricts near-term deliveries."[88]

---

[84] *Id.* ¶ 188.

[85] *Id.* ¶ 189.

[86] *Id.* ¶ 190.

[87] *Id.* ¶ 191.

[88] *Id.* ¶ 211.

On November 12, *The Wall Street Journal* published an article entitled "Boeing Withheld Information on 737 Model, According to Safety Experts and Others" (the "*WSJ* Article").[89] It reported that "neither airline managers nor pilots had been told such a[n MCAS] system had been added to the latest 737 variant—and therefore aviators typically weren't prepared to cope with the possible risks."[90] It reported disdain by pilots who questioned why they were not properly trained on the MCAS system.[91] Finally, the *WSJ* Article reported that the FAA learned the new flight control systems "were not highlighted in any training materials or during lengthy discussions between carriers and regulators about phasing in the latest 737 derivatives" and that Boeing purposefully withheld that critical information.[92]

### 1. The Board Passively Receives Lion Air Crash Updates From Muilenburg, But Does Not Initiate Action.

Management did not bring the Lion Air Crash to the Board's attention for over a week. Muilenburg first contacted the Board, Smith, and McAllister regarding the Lion Air Crash on November 5.[93] His half-page email identified the players in the

---

[89] *Id.* ¶¶ 195–98; *id.* Ex. D.

[90] *id.* Ex D; *id.* ¶ 198.

[91] *Id.* Ex. D ("It's pretty asinine for them to put a system on an airplane and not tell pilots who are operating the airplane, especially when it deals with flight controls . . . . Why weren't they trained on it?"); *id.* ¶ 198.

[92] *id.* Ex. D; *id.* ¶ 197.

[93] *id.* ¶¶ 208–09; Defs.' Ex. 55.

investigation, reported that the Indonesian investigator "publicly said today that the airspeed indicator on the airplane that crashed was damaged during the last four flights of the airplane," and concluded, "We believe the 737 MAX fleet is safe."[94] It did not mention MCAS, the lack of redundancy for a faulty sensor, or the missing sensor alert or specific pilot instructions.

Muilenburg updated the Board again between November 8 and 23, spurred by unfavorable information about the 737 MAX and Lion Air Crash becoming public.[95] On November 13, Director Arthur Collins forwarded Muilenburg a news summary: "I am sure you have already read [the *WSJ* Article] and will brief the [B]oard on this topic."[96] Muilenburg consulted with then-current and former Lead Directors Calhoun and Duberstein about the *WSJ* Article and its fallout.[97] Calhoun advised Muilenburg to contact the Board. And so on November 13, Muilenburg sent a memo to the Board regarding the Lion Air Crash.[98] He told the Board the *WSJ* Article was "categorically false" and "wrongly claims Boeing withheld from customers and flight crews information related to a pitch augmentation system that's unique to the

---

[94] Defs.' Ex. 55.

[95] *See* Defs.' Ex. 53; Defs.' Ex. 56; Defs.' Ex. 57; Defs.' Ex. 58.

[96] Am. Compl. ¶ 212.

[97] *See id.* Ex. E.

[98] *See id*. Ex. D.

737 MAX."[99]  And he blamed the Lion Air flight crew for the crash.[100]  He did not explain that Boeing knew MCAS was vulnerable and susceptible to failure, nor that pilots were not informed about or trained on MCAS.

The next day, Muilenburg informed Duberstein that Calhoun "suggested that my note to the Board focus solely on the Lion Air matter given the importance and visibility," and that he would update the Board on Lion Air the following weekend.[101]  Duberstein's response focused on the negative public reaction to the Lion Air Crash and its impact on production:  "Press is terrible.  Very tough.  Lots of negative chatter I'm picking up.  Not pleasant.  We need to address more aggressively concerns merging re 737 line, deliveries, and Lion Air."[102]  Muilenburg responded that he was "working all angles" on public relations, government relations, and investor relations, including "working airline operations leaders to get messages and counter pilot comments (who are motivated to get separate type rating for MAX – equals more pay)."[103]

On November 17, Boeing executives, including Muilenburg, Smith, McAllister, Hyslop, and Luttig, discussed a *Bloomberg* article that Muilenburg

---

[99] *Id.*; Defs.' Ex. 57.

[100] Am. Compl. Ex. D.

[101] *See id*. Ex. E.

[102] *Id.*

[103] *Id.*; *id*. ¶ 214.

characterized as "filled with misleading statements and inaccuracies – implying that we hid MCAS from operators and that procedures were not covered in training/manuals."[104]

On November 18, after *The New York Times* published an article addressing MCAS's role in the Lion Air crash, Muilenburg sent the Board another letter.[105] He bemoaned "a steady drumbeat of media coverage—and continued speculation—on what may have caused the accident" and again falsely suggested that the 737 MAX was safe.[106] Muilenburg took the same position in November 19 and 20 internal messages to Boeing employees and executives.

Then, on November 21, Muilenburg emailed the Board to invite them to an "optional" November 23 Board call for an update on the Lion Air Crash from Muilenburg, Luttig, and Smith.[107] This was the first time the Board convened after the crash. There are no minutes. Management's talking points for the call explained that erroneous AOA data "contributed to the mishap," and that the Lion Air repair shop may not have followed the approved repair process on the sensor.[108] The

---

[104] *Id.* ¶ 217.

[105] Defs.' Ex. 58; Am. Compl. ¶ 218.

[106] Defs.' Ex. 58.

[107] Am. Compl. ¶¶ 223–24; Defs.' Ex. 59 ("Consider this phone call 'optional', understanding that many of you have family and friend activities planned for this coming weekend.").

[108] Defs.' Ex. 86.

talking points included an explanation of MCAS, and described Boeing's post-Lion Air Crash updates to operators regarding erroneous AOA sensors and MCAS. They also explained the "further safety enhancement" of a software update "that will limit the airplane's response in case of erroneous AOA sensor data" and "further reduce the risk associated with a discrepant AOA sensor and help reduce pilot workload."[109] The talking points also provided that "the function performed by MCAS" was referenced in the FCOM, that the "appropriate flight crew response to uncommanded trim, regardless of cause, is contained in existing procedures," and that "any suggestion that we intentionally withheld information about airplane functionality from our customers simply isn't true."[110] They disclosed a meeting the week before with the acting FAA Administrator, who "understood how MCAS works and believes the 737 MAX is a safe airplane," and who knew about the repair shop investigation. Finally, the talking points expressed frustration with people "commenting freely, including customers, pilot unions, media, and aerospace industry punditry," and addressed Lion Air's orders, other customers' orders, and Boeing's stock price.[111]

---

[109] *Id.*

[110] *Id.*

[111] Am. Compl. ¶ 224; Defs.' Ex. 86.

Muilenburg's subsequent written communications to the Board again blamed Lion Air's crew, and stressed that Boeing's external statement denying its fault was "showing up in the initial media coverage, which has focused largely on Lion Air's operations, maintenance practices and decision to fly with malfunctioning angle of attack sensors."[112] Muilenburg encouraged Boeing's public relations team to maintain that the 737 MAX was safe, and on December 13, he reported to the Board that "members of our Communications team met with *Wall Street Journal* editors in New York to further discuss ongoing coverage and restate our expectation for fair and fact-based reporting."[113]

> 2. **The Board Formally Addresses The Lion Air Crash For The First Time In December 2018, But Does Not Focus On The 737 MAX's Safety Then Or Thereafter.**

After the November 23 optional update, the Board did not formally convene and address the Lion Air Crash until its regularly scheduled Board meetings on December 16 and 17. Consistent with the fact that safety was not a regular topic of Board discussion, the minutes reflect that the Board's primary focus relating to the 737 MAX and Lion Air Crash was on restoring profitability and efficiency in light of longstanding supply chain issues. Over the course of two days, the Board

---

[112] Am. Compl. ¶ 226.

[113] Defs.' Ex. 60; *see* Am. Compl. ¶ 227.

allocated five total minutes to eight different "Watch Items," one of which was "progress working through supply chain and factory disruption affecting MAX deliveries."[114] The Board allocated another five minutes to reviewing a four-page legal memo "including matters related to the Lion Air incident."[115] And it allocated ten minutes to Compliance Risk Management.[116] The associated risk management report contained one page on the FAA Settlement, which said nothing about the 737 MAX or airplane safety generally.[117] In the Executive Session presentation, the "Lion Air incident" was listed as a "Hot Topic."[118]

The Audit Committee met, too. The material it intended to present to the full Board included an "Ethics and Compliance Update," but did not contain any meaningful information about the 737 MAX's safety or safety generally.[119] An Ethics and Compliance Update presentation dated December 17, 2018, included a chart summarizing "Substantiated Cases" of eight categories of "Inquiries and Investigations," including "Safety, Health & Environmental" alongside "Sexual Harassment," "Proper Use of Co. Time or Resources," and "Information

---

[114] Defs.' Ex. 61 at 2; Defs.' Ex. 84 at -618197, -618203.

[115] Defs.' Ex. 14; Defs.' Ex. 61 at 2; Defs.' Ex. 84 at -618197, -618204–07. That memo was wholly redacted in Defendants' Section 220 production.

[116] Defs.' Ex. 84 at -618197.

[117] *Id.* at -618233.

[118] Am. Compl. ¶ 231.

[119] Defs.' Ex. 84 at -618218–28.

Integrity."[120] The agendas for the Audit Committee's forthcoming 2019 meetings did not indicate any focus on airplane safety.[121] The December 16 and 17 Board meeting did not result in any meaningful action to address airplane safety by either the full Board or the Audit Committee.

The Board next received information about the Lion Air Crash on January 16, 2019, when Muilenburg sent his monthly business summary and competitor dashboard.[122] It began with a one-paragraph "brief update on the ongoing Lion Air flight 610 accident investigation" that was proceeding with Boeing's "full support."[123] Muilenburg also noted that Boeing is "exploring potential 737 MAX software enhancements that, if made, would further improve the safety systems," and maintained that "airlines around the world continue to operate the MAX safely" and were "ma[king] significant new orders and commitments, expressing strong confidence in the airplane."[124] After mentioning safety in passing, Muilenburg moved on to a detailed discussion of the market's confidence in the 737 MAX, and Boeing's "financials" and "strong operating performance and solid cash generation," which were "driven by solid commercial . . . deliveries . . . as well as continued

---

[120] *Id.* at -618225.

[121] *Id.* at -618301.

[122] Am. Compl. ¶ 233; Defs.' Ex. 62.

[123] Defs.' Ex. 62.

[124] *Id.*

focus on productivity."[125] He expressed that Boeing had "set a new industry and company record and validated our team's 737 recovery efforts," and noted that 2019 was "already off to a strong start," as the Company was "focus[ed]" on "driving 737 production line stability and preparation for the 57 aircraft per month rate decision."[126] The dashboard concluded with an overview of political issues affecting the Company.[127]

Muilenburg sent his next monthly business summary and competitor dashboard to the Board on February 13.[128] It did not mention the Lion Air Crash.[129] Muilenburg wrote that Boeing would continue to work with the FAA on a "737 MAX software enhancement that, when implemented, will further improve system safety;" that "[d]espite recent media speculation," nothing had been decided about the "software update and its timing;" and that "[w]e'll keep engaging media and other stakeholders on the merits of the airplane, our processes and our people."[130] It went on:

> And on 737, we're driving production line stability and engaging key suppliers, with a particular focus on CFM engines, as we prepare for a decision later this year on increasing rate to 57 airplanes per month. . . .

---

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] Am. Compl. ¶ 234; Defs.' Ex. 63.

[129] *See generally* Defs.' Ex. 63.

[130] *Id.* at -13683.

We remain on track to achieve our quarterly delivery target of 206 planes (including 147 737s), and ramp-up of 737 deliveries in February and March remains an intense focus area.[131]

And it highlighted financials, noting that "Boeing stock [recently] closed at an all-time high."[132]

One week later, on February 20, Executive Vice President and General Counsel Michael Luttig provided a report to the Audit Committee summarizing significant legal matters, including the "Lion Air Accident."[133]

### 3. The Board Decides To Forego Investigation, And Boeing Belatedly Admits It Deceived The FAA.

The Board next met formally on February 24 and 25. As reflected in the Executive Session presentation, two of the "Other Updates" on "Key Topics" were "737 Production" and "Lion Air Accident."[134] On February 25, the Board issued an addendum to its meeting minutes summarizing a legal update from Luttig.[135] The addendum states that the Board "decided to delay any investigation until the conclusion of the regulatory investigations or until such time as the Board determines that an internal investigation would be appropriate."[136]

---

[131] *Id.* at -13862.

[132] *Id.*

[133] Defs.' Ex. 15. The remainder of that report was redacted in the Section 220 production.

[134] Defs.' Ex. 64 at -575.

[135] Pls.' Ex. 4; Am. Compl. ¶ 238.

[136] Pls.' Ex. 4.

43

By January 2019, the Department of Justice ("DOJ") had opened a criminal investigation into whether Boeing had defrauded the FAA when obtaining certification of the 737 MAX. In February 2019, Boeing gave the DOJ Forkner's November 2016 text messages admitting he had lied to the FAA.[137] Muilenburg and Luttig were aware of the text messages in the first couple of months of 2019. Muilenburg, Luttig, and Boeing did not provide those text messages to the FAA until October 2019. The FAA demanded an explanation for Forkner's remarks and "Boeing's delay in disclosing the document to its safety regulator."[138]

As stated in Boeing's eventual 2021 agreement with the DOJ, Boeing "did not timely and voluntarily disclose to the Fraud Section the offense conduct described in the Statement of Facts" and Boeing's cooperation "was delayed and only began after the first six months of the Fraud Section's investigation, during which time the Company's response frustrated the Fraud Section's investigation."[139] As a result, Boeing agreed to pay a "Total U.S. Criminal Monetary Amount" of $2.513 billion, composed of a criminal monetary penalty of $243.6 million, compensation payments to Boeing's 737 MAX airline customers of $1.77 billion, and the establishment of a $500 million crash-victim beneficiaries fund.[140]

---

[137] Am. Compl. ¶¶ 10, 235, 290; *id*. Ex. A; *id.* Ex. B.

[138] Pls.' Ex. 5; Am. Compl. ¶ 278.

[139] Am. Compl. Ex. B ¶¶ 4(b)–(c); *id*. ¶¶ 13, 106, 123, 239, 290.

[140] *Id*. ¶ 296; *id*. Ex. B.

### 4. MCAS Causes The Ethiopian Airlines Crash.

On March 10, less than one month after the Board declined to pursue an internal investigation, another 737 MAX crashed. Ethiopian Airlines Flight ET 302 went down shortly after taking off, killing all 157 passengers and crew. The pilots followed Boeing's recommended emergency procedures, but could not regain control of the plane because MCAS repeatedly activated.

### 5. Muilenburg Does Damage Control, But The Board Does Not Assess The Safety Of Boeing's Airplanes.

Boeing quickly issued a public statement before authorities released any details about the Ethiopian Airlines Crash. On March 11, the Company emphasized that if the Ethiopian Airlines pilot followed the checklist of procedures in the flight manual, he "[would] always be able to override the flight control using electric trim or manual trim."[141] But by that time, one-third of the world's fleet of in-service 737 MAX aircraft had been grounded, and several United States Senators called for the FAA to ground the 737 MAX.

That same day, Muilenburg emailed the Board. While stating that "[o]ur objective is to ensure our teams are centered on our priorities, including safety, quality and stability,"[142] Muilenburg's comments were not geared toward taking

---

[141] *Id.* ¶ 248.

[142] Defs.' Ex. 66 at -620851.

45

action to address and improve the 737 MAX's safety. Nor were they made in response to any Board inquiry as to the airplane's safety. Instead, Muilenburg addressed the Board's objectives for the 737 MAX: "ongoing production operations," revenue, and reputational achievement.[143] He advised the Board that management was engaging in extensive outreach with Boeing's customers and regulators to "reinforce our confidence in the 737 MAX."[144] He touted that the FAA had issued a notification reinforcing the 737 MAX's airworthiness, and "mentioned the pending MAX software enhancement with the expectation it will mandate upgrade in April."[145] He concluded by addressing how Boeing intended to handle the Ethiopian Airlines Crash in the media and internal communications, and directed inquiries to Boeing's media relations team.

Thereafter, Muilenburg reviewed and responded to an all-employee email prepared by that team. He thought the note was "solid," but "lack[ed] a statement about our confidence in the fundamental safety of the MAX."[146]

> This goes back to our discussion last night on answering two basic questions: *is the MAX safe? And was MCAS involved? We need to make a strong statement on the first, and be clear that there are no supporting facts on the second.*[147]

---

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] Am. Compl. ¶ 243.

[147] *Id.*

46

Muilenburg emailed the Board again on March 12, providing a "quick interim update" before a formal Board call the following day.[148]  Muilenburg stated that "[a]s you've seen in the news flow today, additional international authorities have grounded the 737 MAX," but assured the Board that those decisions were driven solely by "public/political pressure, not by any new facts."[149]

During this pivotal period, Boeing was engaged in continuous conversations with the FAA, and Muilenburg spoke with Department of Transportation Secretary Elaine Chao and President Donald Trump in an attempt to keep the 737 MAX flying. On March 12, FAA officials reiterated their position that domestic flights of the 737 MAX would continue.  At least one director, Liddy, praised Muilenburg's efforts during this period.[150]

6.     **The FAA Grounds The 737 MAX, But The Board's Focus Remains On Restoring Boeing's Reputation And Sales.**

On March 13, the FAA's investigation of the Ethiopian Airline Crash indicated that the plane experienced the same pattern of repeated steep dives and

---

[148] Defs.' Ex. 68.

[149] *Id.*

[150] Am. Compl. ¶ 252 ("I, for one, really appreciate the strong leadership you're demonstrating in a very challenging situation.  Your leadership will prevail.").

climbs caused by MCAS that preceded the Lion Air Crash. The FAA grounded the 737 MAX, becoming the final major aviation regulator to do so.

After the FAA grounded the planes, the Board held a call with management regarding the Ethiopian Airlines Crash and whether Boeing should itself ground the fleet.[151] The Board did not consider, deliberate, or decide on grounding the plane or other immediate remedial measures until after the second crash and the FAA's grounding over Boeing's objection. No Board minutes or agendas between November 2018 and March 2019 reference a discussion about grounding the 737 MAX.

Nonetheless, Boeing jumped at the opportunity to claim credit for the grounding. Later on March 13, Muilenburg told the Board that Boeing had managed to get its own messaging out about the grounding before the FAA released its statement.[152]

That evening, Muilenburg followed up with his monthly business update, which began with his efforts to rehabilitate Boeing's image.[153] In particular, he shared that "Kevin McAllister and I spent time walking the 737 production line in Renton, where we filmed a joint video for team members."[154] With the comment

---

[151] *See* Defs.' Ex. 69; Am. Compl. ¶¶ 255–56.

[152] Defs.' Ex. 69.

[153] Defs.' Ex. 70.

[154] *Id.*

that "safety . . . is our top priority," Muilenburg disclosed that for the first time, he "added safety metrics to our monthly report."[155] This marked one of the first formal implementations of safety reporting to the Board. Muilenburg initiated this update. His addition continued to focus on production, including "year-to-date targets and actuals for lost workday cases, recordable injuries and near misses."[156] His March business summary then turned to the 737 MAX's business performance and ability to meet delivery targets.[157]

Over the next six weeks, Muilenburg's communications to the Board focused on restoring Boeing's reputation and returning the 737 MAX to service. And some Directors' messages to Muilenburg echoed his focus on reputational and production triage. For example, on March 21, Giambastiani emailed Muilenburg to direct him to an article from *Aviation Week* and emphasized a comment suggesting the pilots were at fault for the two crashes.[158] And on March 26, Duberstein emailed Muilenburg to inquire about the reputational impact of an emergency landing of a Southwest 737 MAX due to engine problems, complaining that the report "[l]ed the network news" and was "[a]nother reputational hit at us and no comment from us."[159]

---

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] Am. Compl. ¶ 259 ("More importantly for the pilot . . . FLY THE PLANE.").

[159] *Id.* ¶ 260.

On April 4, a preliminary report on the Ethiopian Airlines Crash identified MCAS as a contributing cause for the accident. After sending a draft to the full Board, Boeing issued a press release maintaining that most "accidents are caused by a chain of events" and that was the case for the two crashes.[160]

### E. In April 2019, The Board Adopts Safety Oversight Measures.

Some directors questioned Boeing's approach. On March 15, Arthur Collins and then-Lead Director David Calhoun recommended a Board meeting devoted to product safety. As Collins explained to Calhoun,

> In light of the two 737 MAX 8 crashes and subsequent global fleet grounding, the previous grounding of Air Force KC-46 tankers, and the Amazon 767 cargo plane crash, I believe we should devote the entire board meeting (other than required committee meetings and reports) to a review of quality within Boeing. This would start with an update on what we know about each of the three previously mentioned situations, but then include a review of quality metrics and actions that are either currently in place or planned to assure that the highest level of quality is designed into all Boeing products or incorporated into all manufacturing, customer training, and service support activities. In addition to providing necessary information for the Board, this type of agenda would underscore the board's (and management's) unwavering commitment to quality and safety above all other performance criteria. I recognize that this type of approach needs to be communicated carefully so as not to give the impression that the board has lost confidence in management (which we haven't) or that there is a systemic problem with quality throughout the corporation (which I don't believe there is), but I'm sure this can be done. . . . I'll leave the decision in your hands with Dennis [Muilenburg].[161]

---

[160] *Id.* ¶ 262.

[161] *Id.* Ex. C.

Collins followed up on the "category of 'lessons learned,'" reminding Calhoun that, at Medtronic (on whose board they both had served), Collins "began each board meeting, executive committee meeting, and operating review with a review of product quality/safety—before any discussion of financial performance, market share/competitive activities, new product development timetables, and certainly stock price."[162]  He stressed that people "paid close attention to the priorities of senior management, and everyone in the corporation understood that nothing was more important to the CEO and the board than quality/safety," and that "[i]t's hard to quantify the impact of this approach, but it certainly was important."[163]

Calhoun forwarded Collins's messages to Muilenburg, who responded that it was "[g]ood input"; that he "added Safety data to the Board lead-off briefing, and just added it to my monthly Board note too"; and that "just so you know, Safety data is the first data we look at during our internal ExCo reviews."[164]  Thereafter, Muilenburg and Calhoun held a call regarding Collins's suggestions for making safety a Board priority.[165]

At the Board's next regularly scheduled meeting on April 28 and 29, the Board focused on the Ethiopian Airlines Crash and its implications for the Company.  In

---

[162] *Id.*

[163] *Id.*

[164] *Id.*  I infer "ExCo" refers to management's Executive Council.

[165] *See id.*

contrast to prior Board meetings, the Board dedicated approximately two hours and fifteen minutes to discussing the 737 MAX. For the first time, the Board critically assessed MCAS, the FAA certification process, and pilot training requirements.

The Board also initiated Board-level safety reporting for the first time. On April 4, the Board established the Committee on Airplane Policies and Processes (the "Airplane Committee"). Even then, the Airplane Committee's fact-finding sessions intended to inform the Committee's conclusions and recommendations were sparsely attended: Giambastiani was the sole Board attendee at more than half of the Committee's eighteen fact-finding sessions with internal and external experts, including on topics such as airline training requirements and an overview of BCA's safety process.

Between April and August 2019, the Airplane Committee entertained presentations on seven new topics—including "[c]ommercial airplane design and manufacturing and policies and processes," "aircrew training requirements," and "engineering and safety organizational structures in related industries"—none of which had been the subject of previous Board briefings.[166] For example, in April 2019, Lynne Hopper, Boeing's Vice President of BCA Engineering, and Beth Pasztor, BCA's Vice President of Safety, Security & Compliance, presented to the Board for the first time.

---

[166] *Id.* ¶ 70.

On May 6, for the first time, the Airplane Committee formally requested information about the cause of the crashes. As Committee chair, Giambastiani asked Hyslop to provide information about pilot training requirements, Boeing's "Quick Action" checklists for emergencies, and airlines that had purchased an AOA disagree alert.[167] And in late June, Giambastiani proposed that product safety reports evaluated by the SRB "should feed to [A]udit [C]ommittee" and "should go to CTO/CFO and [be] shared with Board"; that the Audit Committee should have "visibility of high risk issues"; and that "the entire list of safety issues on the MAX [should be] reported to Dennis [Muilenburg]/Greg [Hyslop]."[168]

The Airplane Committee also recommended that the Board establish another committee dedicated to safety. And so on August 26, the Board established the Aerospace Safety Committee "for the purpose of assisting the Board in the oversight of the safe design, development, manufacture, production, operations, maintenance, and delivery of the aerospace products and services of the Company."[169] It was also responsible for overseeing the airplane certification process and Company protocols for engaging with the FAA. In turn, the Aerospace Safety Committee quickly recommended that the Board create yet another oversight committee. On September

---

[167] *Id.* ¶ 72.

[168] *Id.* ¶ 81 (alteration in original).

[169] *Id.* ¶ 73.

30, the Board created a Product and Services Safety Organization that was responsible for, among other things, investigating "cases of undue pressure and anonymous product and service safety concerns raised by employees," and represented Boeing's first mechanism or reporting line to convey employee complaints to the Board.[170]

Product safety reporting processes up to executives and the Board were operational by October 20. And at the December 15 Board meeting, the Audit Committee received a compliance risk management report from chief compliance and ethics officer Sands that, for the first time, included a category for "Safety." In comparison, Sands's report from the December 2018 Board meeting following the Lion Air Crash had not covered product safety at all.

Muilenburg also embraced the new focus on safety. In an email to McAllister, Hyslop, Smith, and other senior Boeing officials, he wrote,

> As *part of our lessons learned from the MAX, we need to have a clear understanding of how safety risk is being assessed*, and appropriately "test" those items that are assessed as "medium" or at a "minor" or "major" hazard level to ensure the right visibility/action/communication. . . . This is an exceptionally important process improvement area for us all.[171]

---

[170] *Id.* ¶ 93.

[171] *Id.* ¶ 82.

By late 2019, Muilenburg began receiving "granular weekly reports of potential safety issues discussed at meetings of rank-and-file engineers - something that did not happen in the past."[172] And Muilenburg eventually acknowledged that access to better information would have supported grounding the 737 MAX fleet shortly after the Lion Air Crash.[173]

## F. The Board Attempts To Preserve Its Image, Despite Eschewing Safety Oversight Initiatives Until April 2019.

The Board publicly lied about if and how it monitored the 737 MAX's safety. As the Board was establishing formal safety monitoring processes, then-Lead Director Calhoun held a series of interviews with major newspapers with the following corporate objective: "Position the Boeing Board of Directors as an independent body that has exercised appropriate oversight."[174] As to the Lion Air Crash, Calhoun represented that the Board had been "notified immediately, as a board broadly," after the Lion Air crash and met "very, very quickly" thereafter;[175] participated in evaluating the safety risk associated with the 737 MAX; and considered grounding the 737 MAX after the Lion Air Crash, but concluded the

---

[172] *Id.* ¶ 83.

[173] *Id.* ¶ 84 ("[I]f we knew back then what we know now, we would have grounded right after the first accident.").

[174] *Id.* ¶ 263.

[175] *Id.* ¶¶ 268–69.

crash "was an anomaly" that did not warrant grounding the airplane.[176] As to the Ethiopian Airlines Crash, Calhoun represented that the Board met within twenty-four hours of the crash to discuss potential grounding of the 737 MAX and recommended that the 737 MAX be grounded. Each of Calhoun's representations was false.

In addition, Calhoun and the Board would publicly denounce Muilenburg. Muilenburg had come under fire from the FAA, but as of November 5, 2019, Calhoun maintained that, "[f]rom the vantage point of our board, Dennis has done everything right."[177] With additional scrutiny, regulators learned the extent of Boeing's deceit under Muilenburg's leadership, and the FAA came down on him. On December 22, after learning that the FAA had reprimanded Muilenburg and after *The New York Times* published an article reporting on his deficiencies, the Board called a meeting and voted to terminate Muilenburg and replace him with Calhoun, "to restore confidence in the Company moving forward as it works to repair relationships with regulators, customers, and all other stockholders."[178]

The Board did not terminate Muilenburg for cause, and publicly characterized his departure as his "resignation," and later as his "retirement."[179] In doing so, the

---

[176] *Id.* ¶ 271.

[177] *Id.* ¶ 280.

[178] *Id.* ¶¶ 284–85.

[179] *Id.* ¶¶ 288–89.

Board enabled Muilenburg to retain unvested equity awards worth approximately $38,642,304.[180] The Board also announced that Luttig would "retire," allowing him to keep his unvested equity awards as well.[181] As alleged, the Board chose this path because "[a]ny public dispute between Boeing and Muilenburg would have exposed the Board's prolonged support of Muilenburg and lack of safety oversight."[182]

Calhoun became CEO in January 2020. In that role, he publicly questioned Muilenburg's leadership, shifting blame away from the Board. Calhoun stated that the Board "never seriously questioned [Muilenburg's] strategy, in part because before the first MAX crash off the coast of Indonesia in October 2018, the company was enjoying its best run in years," and painted Muilenburg as a money-hungry leader that was willing to prioritize profits over quality and safety.[183] In Calhoun's words, "If [the Board] w[as] complacent in any way, maybe, maybe not, I don't know. . . . We supported a C.E.O. who was willing and whose history would suggest that he might be really good at taking a few more risks."[184]

---

[180] *Id.* ¶ 286.

[181] *Id.* ¶ 289.

[182] *Id.* ¶ 287.

[183] *Id.* ¶ 291 (quoting a *New York Times* article as stating, "[Calhoun had] never be able to judge what motivated [Muilenburg], whether it was a stock price that was going to continue to go up and up, or whether it was just beating the other guy to the next rate increase," and that "[i]f anybody ran over the rainbow for the pot of gold on stock, it would have been [Muilenburg]").

[184] *Id.* (alterations in original).

### G.     Corporate Trauma Inspires This Suit.

The 737 MAX fleet was grounded for twenty months, until November 18, 2020. During that period, Boeing was federally mandated to cure the defects in the 737 MAX's MCAS system and AOA sensor and to revamp pilot training. But these measures did not rectify the significant damage the Lion Air and Ethiopian Airlines Crashes and the 737 MAX Grounding caused to Boeing's profitability, credibility, reputation, and business prospects. Nor did they unwind Boeing's exposure to substantial criminal, regulatory, and civil liability. In 2020, Boeing estimated that it had incurred non-litigation costs of $20 billion, and litigation-related costs in excess of $2.5 billion. Litigation continues on multiple fronts, and customers cancelled orders. And in January 2021, Boeing consented to the filing of a criminal information charging the Company with conspiracy to defraud the United States and thereby incurring billions of dollars in penalties.[185]

The corporate harm Boeing suffered inspired numerous books and records requests and derivative actions filed in this Court in 2019. The Court consolidated the plenary actions and appointed NYSCRF and FPPA as Co-Lead Plaintiffs on August 3, 2020.[186] Plaintiffs filed the Verified Amended Consolidated Complaint on January 29, 2021 (the "Amended Complaint"), addressing the DOJ's criminal

---

[185] *Id.* ¶ 11; Am. Compl. Ex. B.

[186] D.I. 88.

penalties.[187] Count I asserts a derivative claim for breach of fiduciary duty against the Director Defendants, alleging they consciously breached their fiduciary duties and violated their corporate responsibilities by (1) before the Lion Air Crash, failing to implement any reasonable information and reporting system to monitor and oversee the safety of Boeing's airplanes; (2) after the Lion Air Crash, despite being made aware of red flags concerning the operation, development, and nondisclosure of MCAS, consciously disregarding their duty to investigate and to remedy any misconduct uncovered; and (3) after the Ethiopian Airlines Crash, falsely assuring the public about the safety of the 737 MAX and MCAS and deciding to cash out Muilenburg's unvested equity-based compensation.[188] Count II asserts a derivative claim for breach of fiduciary duty against the Officer Defendants, alleging they consciously breached their fiduciary duties or, at a minimum, acted with gross

---

[187] *See generally* Am. Compl.

[188] *Id.* ¶ 305. Plaintiffs originally alleged that the Director Defendants breached their fiduciary duties before the Lion Air Crash by ignoring several red flags concerning airplane safety. *Id.* At oral argument, Plaintiffs shifted this theory. *See* Hr'g Tr. 135–36 ("MR. FRIEDLANDER: Frankly, Your Honor, I think it's better not to think of those as red flags for *Marchand* in the sense of that -- like *Marchand* never uses the concept of red flags. . . . I would say these are points of emphasis to illustrate the problems that the reporting system had . . . because there's an affirmative obligation to create a reporting system of the type described in *Marchand*. We're saying they didn't do it, and then we said which *Marchand* requires. And as a second argument, and they had red flags and nonetheless they still didn't do it. But really it's all incorporated under the affirmative obligation of *Marchand* to create it. THE COURT: So you would like me to look at those more under prong one as a deficient reporting system [rather] than under prong two, red flags? MR. FRIEDLANDER: Yeah. But I think they're important . . . .").

negligence by (1) consciously and repeatedly failing to implement and actively monitor or oversee a compliance and safety program; (2) consciously disregarding their duty to investigate red flags and to remedy any misconduct uncovered; and (3) covering up the extreme safety risks of Boeing's aircraft.

On March 19, Defendants moved to dismiss pursuant to Court of Chancery Rules 12(b)(6) and 23.1 (the "Motion").[189] Defendants submitted eighty-eight exhibits in support of the Motion.[190] The parties briefed the Motion as of June 4.[191] I heard argument on June 25 and took the Motion under advisement.[192]

## II.    ANALYSIS

Defendants have moved to dismiss all claims against them pursuant to Court of Chancery Rule 23.1 for failure to plead that demand is futile.

Plaintiffs assert Defendants' breaches of fiduciary duty harmed Boeing. Thus, the claims belong to Boeing and the decision whether to pursue the claim presumptively lies with the Board.[193] But our law recognizes that, "[i]n certain

---

[189] D.I. 145; D.I. 146.

[190] D.I. 147; D.I. 148; D.I. 149; D.I. 150; D.I. 151; D.I. 152; D.I. 160.

[191] D.I. 146; D.I. 155; D.I. 159.

[192] D.I. 167; Hr'g Tr.

[193] *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) ("In most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation."); *see Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of the General Corporation Law of the state of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

circumstances, stockholders may pursue litigation derivatively on behalf of the corporation as a matter of equity to redress the conduct of a torpid or unfaithful management . . . where those in control of the company refuse to assert (or are unfit to consider) a claim belonging to it."[194] "Because stockholder derivative suits by [their] very nature . . . impinge on the managerial freedom of directors, our law requires that a stockholder satisfy the threshold demand requirements of Court of Chancery Rule 23.1 before he is permitted to assume control of a claim belonging to the corporation."[195]

Rule 23.1 requires pleadings to "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[196] To satisfy Rule 23.1, the stockholder must plead with particularity either that she made a demand on the company's board of directors to pursue particular claims and was refused, or why any such demand would be futile, thereby excusing the need to make a demand altogether.[197] Where, as here,

---

[194] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *27 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021) (quoting *Cumming v. Edens*, 2018 WL 992877, at *11 (Del. Ch. Feb. 20, 2018) (internal quotation marks omitted)).

[195] *Horman v. Abney*, 2017 WL 242571, at *6 (Del. Ch. Jan. 19, 2017) (quoting *Aronson*, 473 A.2d at 811) (internal quotation marks omitted).

[196] *Brehm*, 746 A.2d at 254; *accord In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120–21 (Del. Ch. 2009).

[197] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004); *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

the stockholder plaintiff foregoes a demand on the board, she "must plead particularized facts creating a reasonable doubt concerning the Board's ability to consider the demand."[198]

Demand futility turns on "whether the board that would be addressing the demand can impartially consider [the demand's] merits without being influenced by improper considerations."[199] While the continued utility of a binary approach to demand futility has been called into question, for now, Delaware still applies one of two tests when deciding whether demand upon the board would be futile.[200] The first, established in *Aronson v. Lewis*, "applies to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties."[201] The second, established in *Rales v.*

---

[198] *CBS*, 2021 WL 268779, at *28; *Citigroup*, 964 A.2d at 121 ("Demand is not excused solely because the directors would be deciding to sue themselves. Rather, demand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." (footnotes and internal quotation marks omitted)).

[199] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

[200] *See United Food & Commerc. Workers Union v. Zuckerberg*, 250 A.3d 862, 877 (Del. Ch. 2020) (observing that "the *Aronson* test has proved to be comparatively narrow and inflexible in its application, and its formulation has not fared well in the face of subsequent judicial developments").

[201] *Wood*, 953 A.2d at 140 (citing *Aronson*, 473 A.2d at 814) (explaining the two demand futility tests). Under *Aronson*, the plaintiff must plead particularized facts that create a reasonable doubt that (i) the directors are disinterested and independent or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Id.*

*Blasband*,[202] applies where a majority of the current members of the board "had not participated in the challenged decision,"[203] or "where the subject of a derivative suit is not a business decision . . . [such as when the board is alleged to have violated its] oversight duties."[204]

Here, the parties agree that *Rales* governs.[205] "The central question of a *Rales* inquiry, no matter the context, is the same: 'whether the board can exercise its business judgment on the corporate behalf in considering demand.'"[206] In refining that question, *Rales* instructs that a director cannot objectively exercise her business judgment in considering a demand if she is either (1) "interested," meaning, among other things, that she faces a "substantial likelihood of liability" for her role in the alleged corporate wrongdoing; or (2) not independent of another interested fiduciary.[207]

---

[202] 634 A.2d at 927.

[203] *Zuckerberg*, 250 A.3d at 887.

[204] *Wood*, 953 A.2d at 140; *see also Horman*, 2017 WL 242571, at *6 (holding that *Rales* applies "when a plaintiff challenges board inaction such as when a board is alleged to have consciously disregarded its oversight duties").

[205] *See* D.I. 146 at 58 ("Whether the Board's decision to terminate Muilenburg is considered under *Aronson* or *Rales*, . . . Plaintiffs fail to establish demand futility." (citing *Zuckerberg*, 2020 WL 6266162, at *9–18)); *id.* at 60 (assessing Plaintiffs' claims under *Rales*); D.I. 155 at 38 (citing and applying *Rales*).

[206] *McElrath ex rel. Uber Techs. v. Kalanick*, 2019 WL 1430210, at *8 (Del. Ch. Apr. 1, 2019) (quoting *Inter-Mktg. Gp. USA, Inc. v. Armstrong*, 2019 WL 417849, at *4 (Del. Ch. Jan. 31, 2019)), *aff'd sub nom. McElrath v. Kalanick*, 224 A.3d 982 (Del. 2020).

[207] *Rales*, 634 A.2d at 934, 936 (noting that, at bottom, the court must "determine whether or not the particularized factual allegations of a derivative stockholder complaint create a

"On a motion to dismiss pursuant to Rule 23.1, the Court considers the same documents, similarly accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff—all as it does in considering a motion to dismiss under Rule 12(b)(6)."[208] Given the heightened pleading requirements of Rule 23.1, however, "conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true."[209] "Because of the absence of a precise formula in the Rule for pleading compliance with the demand requirement, the sufficiency of a complaint under Rule 23.1 is determined on the basis of the facts of each case."[210]

"Rule 23.1 does not abrogate Rule 12(b)(6)."[211] But because "the standard under Rule 12(b)(6) is less stringent than the standard under Rule 23.1, a complaint that survives a Rule 23.1 motion to dismiss generally will also survive a Rule

---

reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand"); *CBS*, 2021 WL 268779, at *28 (same); *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *11 (Del. Ch. Oct. 1, 2019) (stating that when board oversight is challenged, "such improper influence arises if a majority of the board's members are compromised because [] they face a substantial likelihood of personal liability with respect to at least one of the alleged claims" (internal quotation marks omitted)).

[208] *Beam*, 833 A.2d at 976 (Del. Ch. 2003) (citing *White*, 783 A.2d at 549), *aff'd*, 845 A.2d 1040 (Del. 2004).

[209] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d at 244.

[210] *Brehm*, 746 A.2d at 268 (Hartnett, J. concurring).

[211] *Id.*

12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim."[212] The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[213]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[214] This standard is "minimal"[215] and plaintiff-friendly.[216] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[217] Despite this forgiving standard, the Court need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable

---

[212] *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 285 (Del. Ch. 2003).

[213] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[214] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[215] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[216] *See, e.g., Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021).

[217] *Cent. Mortg. Co.*, 27 A.3d at 536.

inferences in favor of the non-moving party."[218] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[219]

I conclude that (1) Plaintiffs have pled facts sufficient to render demand futile for claims against the Director Defendants, with one carveout, but (2) Plaintiffs have failed to plead demand futility for the claims against the Officer Defendants. Accordingly, the Motion is granted and denied in part as to Count I, and granted as to Count II.

### A. With One Exception, Plaintiffs Have Pled That Demand Is Futile For Claims Against The Director Defendants.

For Count I, Plaintiffs assert demand is futile because "from at least November 18, 2019 (the date of filing of the first derivative complaint alleging demand futility) through and including today, a majority of the members of the Board have faced a substantial likelihood of liability for failing to make any good faith effort to implement and oversee a board-level system to monitor and report on safety."[220] At bottom, Plaintiffs' position is that nine of the twelve board members

---

[218] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[219] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *4 (Del. Ch. July 24, 2009) (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[220] Am. Compl. ¶ 299.

at the time the original complaint was filed[221] face a substantial likelihood of liability for failure to fulfill their oversight duties under the standards set forth in *Caremark*,[222] as applied by the Delaware Supreme Court in *Marchand*.[223]

As Chancellor Allen first observed in *Caremark*, and as since emphasized by this Court many times, perhaps to redundance,[224] the claim that corporate fiduciaries have breached their duties to stockholders by failing to monitor corporate affairs is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[225] A decade after *Caremark*, our Supreme Court affirmed the doctrine Chancellor Allen announced there and clarified that our law will hold directors personally liable only where, in failing to oversee the operations of the company, "the directors knew that they were not discharging their fiduciary

---

[221] *Id.* ¶¶ 22–43; *see id.* ¶ 301 (alleging that when the original complaint was filed, six of the twelve Board members had served for at least five years before the 2019 Ethiopian Airlines Crash); D.I. 146 at 6 n.2 (detailing changes on the Board since the original complaint was filed).

[222] 698 A.2d 959.

[223] 212 A.3d 805.

[224] *See Chou*, 2020 WL 5028065, at *1 ("It has become among the hoariest of Chancery clichés for an opinion to note that a derivative claim against a company's directors, on the grounds that they have failed to comply with oversight duties under *Caremark*, is among the most difficult of claims in this Court to plead successfully.").

[225] *Caremark*, 698 A.2d at 967; *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL4292024, at *7 (Del. Ch. Nov. 30, 2007) (same); *Desimone v. Barrows*, 924 A.2d 908, 939 (Del. Ch. 2007) (same); *Guttman v. Huang*, 823 A.2d 492, 506 n.33 (Del. Ch. 2003) (same).

obligations."[226]  At the pleading stage, a plaintiff must allege particularized facts that satisfy one of the necessary conditions for director oversight liability articulated in *Caremark*: either that (1) "the directors utterly failed to implement any reporting or information system or controls"; or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[227]  I respectfully refer to these conditions as *Caremark* "prong one" and "prong two."

"Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."[228]  Rather, the plaintiff must plead with particularity "a sufficient connection between the corporate trauma and the board."[229]  "To be sure, even in this context, *Caremark* does not demand omniscience."[230]  But it does mandate that "to satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it."[231]

---

[226] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[227] *Id.*

[228] *Desimone*, 924 A.2d at 940.

[229] *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

[230] *Clovis*, 2019 WL 4850188, at *13.

[231] *Marchand*, 212 A.3d at 821.

The *Caremark* standard "draws heavily upon the concept of director failure to act in good faith,"[232] and does not constitute a freestanding fiduciary duty that could independently give rise to liability.[233] Because "[t]he test is rooted in concepts of bad faith," "a showing of bad faith is a *necessary condition* to director oversight liability."[234] As our Supreme Court explained in *In re Walt Disney Co. Derivative Litigation*, the "intentional dereliction of duty" or "conscious disregard for one's responsibilities," which "is more culpable than simple inattention or failure to be informed of all facts material to the decision," reflects that directors have acted in bad faith and cannot avail themselves of defenses grounded in a presumption of good faith.[235] In order to plead a derivative claim under *Caremark*, therefore, a plaintiff must plead particularized facts that allow a reasonable inference the directors acted with scienter which in turn "requires [not only] proof that a director acted

---

[232] *Stone*, 911 A.2d at 369.

[233] *Citigroup*, 964 A.2d at 122–23.

[234] *Id.* at 123.

[235] 906 A.2d 27, 66 (Del. 2006); *Citigroup*, 964 A.2d at 125 ("[O]ne can see a similarity between the standard for assessing oversight liability and the standard for assessing a disinterested director's decision under the duty of care when the company has adopted an exculpatory provision pursuant to § 102(b)(7). In either case, a plaintiff can show that the director defendants will be liable if their acts or omissions constitute bad faith. A plaintiff can show bad faith conduct by, for example, properly alleging particularized facts that show that a director *consciously* disregarded an obligation to be reasonably informed about the business and its risks or *consciously* disregarded the duty to monitor and oversee the business.").

inconsistent[ly] with his fiduciary duties," but also "most importantly, that the director knew he was so acting."[236]

1. **The Motion Is Denied In Part As To Count I; Plaintiffs Have Pled Particularized Facts Demonstrating A Majority Of The Director Defendants Face A Substantial Likelihood Of *Caremark* Liability.**

Plaintiffs' *Caremark* theory breaks the Company's 737 MAX trauma into three periods of time: before the first crash, between the two crashes, and after the second crash. As crystallized at argument, Plaintiffs' theory before the Lion Air Crash maps onto *Caremark*'s first prong, asserting the Board utterly failed to implement any reporting or information systems or controls.[237] Plaintiffs further assert the first Lion Air Crash was a red flag the Board ignored under prong two, while continuing to fall short under prong one. Plaintiffs contend the Board's prong two deficiencies culminated in the Ethiopian Airlines Crash. And after both crashes, Plaintiffs assert the Director Defendants breached their fiduciary duties by allowing Muilenburg to retire with his unvested equity compensation. Plaintiffs have

---

[236] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011) (emphasis omitted); *Citigroup*, 964 A.2d at 123 ("[T]o establish oversight liability a plaintiff must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act.").

[237] *See* Hr'g Tr. 135–36.

sufficiently alleged the Director Defendants face a substantial likelihood of liability under their *Caremark* theories, but not with regard to Muilenburg's compensation.

### a. Plaintiffs Have Stated A Claim Under *Caremark* Prong One.

Directors may use their business judgment to "design context- and industry-specific approaches tailored to their companies' businesses and resources. But *Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting."[238] This oversight obligation is "designed to ensure reasonable reporting and information systems exist that would allow directors to know about and prevent wrongdoing that could cause losses for the Company."[239] "[O]nly a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability."[240]

Our Supreme Court's recent decision in *Marchand* addressed the contours of a *Caremark* prong one claim when the company is operating in the shadow of

---

[238] *Marchand*, 212 A.3d at 821 (footnote omitted).

[239] *Citigroup*, 964 A.2d at 131.

[240] *Id.* at 122 (internal quotation marks omitted).

"essential and mission critical" regulatory compliance risk.[241] Distinct from many *Caremark* cases evaluating the company's systems to monitor financial wrongdoing like accounting fraud,[242] *Marchand* addressed the regulatory compliance risk of food safety and the failure to manage it at the board level, which allegedly allowed the company to distribute mass quantities of ice cream tainted by *listeria.* Food safety was the "most central safety and legal compliance issue facing the company."[243] In the face of risk pertaining to that issue, *Marchand* noted the board's oversight function "must be more rigorously exercised."[244] This "entails a sensitivity to compliance issues intrinsically critical to the company."[245]

*Marchand* held the board had not made a "good faith effort to put in place a reasonable system of monitoring and reporting" when it left compliance with food safety mandates to management's discretion, rather than implementing and then overseeing a more structured compliance system.[246] The Court considered the

---

[241] *Marchand*, 212 A.3d at 824; *see Clovis*, 2019 WL 4850188, at *12.

[242] *E.g.*, *Stone*, 911 A.2d 362; *Hughes*, 897 A.2d 162; *Citigroup*, 964 A.2d 106.

[243] *Marchand*, 212 A.3d at 824 (stating "food safety was essential and mission critical"); *see also id.* at 822 (observing that food safety "has to be one of the most central issues at the company" and "a compliance issue intrinsically critical to the company's [monoline] business operation").

[244] *Clovis*, 2019 WL 4850188, at *13 (citing *Marchand*, 212 A.3d at 824).

[245] *Id.* (alterations, footnotes, internal quotation marks omitted) (quoting *Marchand*, 212 A.3d at 822).

[246] *Marchand*, 212 A.3d at 821–24.

absence of various board-level structures "before the *listeria* outbreak engulfed the company."[247] The Court concluded that the complaint fairly alleged several dispositive deficiencies:

- no board committee that addressed food safety existed;
- no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed;
- no schedule for the board to consider on a regular basis, such as quarterly or biannually, any key food safety risks existed;
- during a key period leading up to the deaths of three customers, management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board;
- the board was given certain favorable information about food safety by management, but was not given important reports that presented a much different picture; and
- the board meetings are devoid of any suggestion that there was any regular discussion of food safety issues.[248]

Like food safety in *Marchand*, airplane safety "was essential and mission critical" to Boeing's business,[249] and externally regulated.[250] Considering

---

[247] *Id.* at 822.

[248] *Id.*

[249] *Id.* at 824.

[250] *See Chou*, 2020 WL 5028065, at *18 ("[W]hen regulations governing drug health and safety are at issue, ABC's Board must actively exercise its oversight duties in order to properly discharge its duties in good faith. The allegations here are a prime example: flouting laws meant to ensure the safety and purity of drugs destined for patients suffering from cancer is directly inimical to the central purpose of ABC's business."); *Clovis*, 2019 WL 4850188, at *13 ("[W]hen a company operates in an environment where externally imposed regulations govern its 'mission critical' operations, the board's oversight function must be more rigorously exercised.").

*Marchand*'s mandate that the board rigorously exercise its oversight function with respect to mission critical aspects of the company's business, such as the safety of its products that are widely distributed and used by consumers, as well as the failings *Marchand* identified as giving rise to the reasonable inference that the board faced a substantial likelihood of liability under prong one, I conclude that Plaintiffs have carried their burden under Rule 23.1 for their prong one claim. To be clear, I do not track the deficiencies *Marchand* identified because they are any sort of prescriptive list; "[a]s with any other disinterested business judgment, directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources."[251] I echo *Marchand* because it is dispositive in view of Plaintiffs' remarkably similar factual allegations.

> ### i. The Board had no committee charged with direct responsibility to monitor airplane safety.

The Amended Complaint alleges the Board had no committee charged with direct responsibility to monitor airplane safety. While the Audit Committee was charged with "risk oversight," safety does not appear in its charter. Rather, its oversight function was primarily geared toward monitoring Boeing's financial risks.[252]

---

[251] *Marchand*, 212 A.3d at 821.

[252] *See* Hr'g Tr. 30–33.

Perhaps because the Audit Committee was not asked to do so, the pleading stage record indicates the Audit Committee did not regularly or meaningfully address or discuss airplane safety. The yearly report the Audit Committee received on Boeing's compliance risk management process did not include oversight of airplane safety.[253] Specifically as to the 737 MAX, the Audit Committee never assessed its safety risks, including those regarding MCAS and the AOA sensor, during its development before the Lion Air Crash or after; nor did the Audit Committee ask for presentations or information on the topic.[254] Similarly, the ERV process and Corporate Audit group did not address airplane safety.[255]

Defendants press that the Audit Committee addressed "risk" broadly, pointing to one-off instances like when it responded to FAA questions about the Dreamliner battery incident, or when it referred to "quality" or "safety" in passing. But those occasional occurrences fail to dislodge Plaintiffs' allegations that the Board did not specifically charge the Audit Committee with monitoring airplane safety. And to the extent Defendants point to risk analysis mechanisms and reports, like the ERV process and the Corporate Audit group,[256] in the absence of any allegation or

---

[253] Hr'g Tr. 20–23.

[254] *Id.* 32.

[255] *See supra* notes 31–32.

[256] *See* Defs.' Ex. 7; Defs.' Ex. 9; Defs.' Ex. 10; Defs.' Ex. 23; Defs.' Ex. 24; Defs.' Ex. 25.

indication that they were devoted to airplane safety, the reasonable inference is that they fall within the Audit Committee's financial and regulatory risk mandate.

At the pleading stage, the existence of the Audit Committee, Corporate Audit group, and ERV process cannot support the conclusion that the Board established any committee or process charged with direct responsibility to monitor airplane safety. To the contrary, the Board did not establish the Airplane Committee, which was explicitly tasked with overseeing airplane safety, until April 2019; the Airplane Committee was the first Board committee to formally request information about the cause of the crashes.

The lack of Board-level safety monitoring was compounded by Boeing's lack of an internal reporting system by which whistleblowers and employees could bring their safety concerns to the Board's attention. More than three months after the Ethiopian Airlines Crash, Giambastiani proposed that once safety concerns were evaluated by the SRB, they should be elevated to the Audit Committee, CTO, and CFO, and thereafter be shared with the Board.

> ii. *The Board did not monitor, discuss, or address airplane safety on a regular basis.*

Zooming out from the committee level, Plaintiffs have alleged specific facts supporting the conclusion that the Board writ large did not formally address or monitor safety. The Board did not regularly allocate meeting time or devote

76

discussion to airplane safety and quality control until after the second crash. Nor did the Board establish a schedule under which it would regularly assess airplane safety to determine whether legitimate safety risks existed.

The period after the Lion Air Crash is emblematic of these deficiencies. The Board's first call on November 23 was explicitly optional. The crash did not appear on the Board's formal agenda until the Board's regularly scheduled December meeting; those board materials reflect discussion of restoration of profitability and efficiency, but not product safety, MCAS, or the AOA sensor.[257] The Audit Committee devoted slices of five-minute blocks to the crash, through the lens of supply chain, factory disruption, and legal issues—not safety.[258]

The next board meeting, in February 2019, addressed factory production recovery and a rate increase, but not product safety or MCAS.[259] At that meeting, the Board affirmatively decided to delay its investigation into the 737 MAX, notwithstanding publicly reported concerns about the airplane's safety. Weeks later, after the Ethiopian Airlines Crash,[260] the Board still did not consider the 737 MAX's

---

[257] *See id.* ¶¶ 230–31; Defs.' Ex. 61; *see also* Defs.' Ex. 64 at -575 (identifying the Lion Air Crash as a "key topic" with no mention of safety).

[258] Defs.'Ex. 14; Defs' Ex. 61 at 2; Defs'. Ex. 84 at -618197, -618203–07.

[259] Am. Compl. ¶ 237; Defs.' Ex. 64 at -575.

[260] Am. Compl. ¶ 248; Defs.' Ex. 66 at -620851.

safety. It was not until April 2019—after the FAA grounded the 737 MAX fleet—that the Board built in time to address airplane safety.[261]

Defendants argue the Board "regularly discussed" safety as part of its strategic initiatives, pointing to slide decks that nod to "safety" as an "enduring value"[262] and as part of a "production system" that was simultaneously focused on "[a]ccelerating productivity."[263] They also point out that the Board was updated on the 737 MAX's development, production, and certification,[264] and that the Board inspected the plants where the 737 MAX was assembled, including on a June 2018 inspection of the Everett production site.[265] Defendants stress that the Board "oversaw the quality and safety of the 737 MAX program through monitoring the progress of the FAA's extensive certification review of the 737 MAX."[266]

But the invocations of safety Defendants highlight must be considered in the broader context Plaintiffs plead. The Board focused on the 737 MAX's production, development, and certification in order to assess production timelines and revenue

---

[261] Am. Compl. ¶ 79; Defs.' Ex. 75; Defs.' Ex. 77.

[262] Defs.' Ex. 16 at -11080, -13052.

[263] Defs.' Ex. 17 at -11645; *see also* Defs.' Ex. 20 at -13057 (including the tagline "[e]nsuring the safety, integrity and quality of Boeing products" in a test evaluation update).

[264] D.I. 146 at 19–22; Defs.' Ex. 8 at -11183; Defs.' Ex. 28; Defs.' Ex. 29; Defs.' Ex. 39 at -8133; Defs.' Ex. -8086; Defs.' Ex. 41 -8314; Defs.' Ex. 52 at -11403.

[265] Defs.' Ex. 26; Defs.' Ex. 27; Defs.' Ex. 28; Defs.' Ex. 29.

[266] D.I. 146 at 20.

expectations, and to strengthen the Company's relationships with FAA officials—not to consider customer safety.[267] The Board and management's passive invocations of quality and safety, and use of safety taglines, fall short of the rigorous oversight *Marchand* contemplates.

And under *Marchand*, minimal regulatory compliance and oversight do not equate to a *per se* indicator of a reasonable reporting system. "[T]he fact that [Boeing] nominally complied with F[A]A regulations does not imply that the *board* implemented a system to monitor [airplane] safety *at the board level*. Indeed, these types of routine regulatory requirements, although important, are not typically directed at the board."[268] The fact that Boeing's management was seeking minimal regulatory certification and periodically informing the Board of its progress in pursuit of production-based business objectives "does not rationally suggest that the board implemented a reporting system to monitor [airplane] safety or [Boeing's] operational performance," as "[t]he mundane reality that [Boeing] is in a highly regulated industry and complied with some of the applicable regulations does not foreclose any pleading-stage inference that the directors' lack of attentiveness rose

---

[267] Am. Compl. ¶¶ 127–28 (addressing board presentations containing taglines such as "*Performance, schedule, and cost certain . . . Stingy with a purpose*" and "*Transforming production system to support market demand*," and "Imperatives" such as "Break Cost Curve," "Faster to Market," and "Affordability Culture").

[268] *Marchand*, 212 A.3d at 823.

to the level of bad faith indifference required to state a *Caremark* claim."[269]  As *Marchand* made plain, the fact that the company's product facially satisfies regulatory requirements does not mean that the board has fulfilled its oversight obligations to prevent corporate trauma.

> ### iii. *The Board had no regular process or protocols requiring management to apprise the Board of airplane safety; instead, the Board only received* **ad hoc** *management reports that conveyed only favorable or strategic information.*

As alleged, the Board did not simply fail to assess safety itself; it also failed to expect or demand that management would deliver safety reports or summaries to the Board on a consistent and mandatory basis.  The Amended Complaint's allegations and exhibits incorporated by reference show that the Board received intermittent, management-initiated communications that mentioned safety in name, but were not safety-centric and instead focused on the Company's production and revenue strategy.  And when safety was mentioned to the Board, it did not press for further information, but rather passively accepted management's assurances and opinions.[270]

---

[269] *Id.*

[270] *See* Defs. Ex. 53; Defs.' Ex. 56; Defs.' Ex. 58; Defs.' Ex. 59; Defs.' Exs. 62–63; Defs.' Ex. 86; Am. Compl. ¶¶ 214, 224, 225, 227, 228.

For mission-critical safety, discretionary management reports that mention safety as part of the Company's overall operations are insufficient to support the inference that the Board expected and received regular reports on product safety.[271] Boeing's Board cannot leave "compliance with [airplane] safety mandates to management's discretion rather than implementing and then overseeing a more structured compliance system."[272] An effective safety monitoring system is what allows directors to believe that, unless issues or "red flags" make it to the board through that system, corporate officers and employees are exercising their delegated powers in the corporation's best interest.[273]

Here, the reports the Board received throughout the 737 MAX's development and FAA certification were high-level reports focused on the Company's operations and business strategy; the Board did not expect any safety content.[274] After the Lion Air Crash, management's communications to the Board demonstrate the lack of a Board process or protocol governing such communications.[275] None of

---

[271] *See Marchand*, 212 A.3d at 823–24.

[272] *Clovis*, 2019 WL 4850188, at *12 (describing *Marchand*).

[273] *See Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007).

[274] *See* Defs.' Ex. 40 at -8086; Defs.' Ex. 41.

[275] *See, e.g.*, Am. Compl. ¶ 91("In July 2018, Boeing's Test and Evaluation department voiced concerns to 'Boeing Executive Leadership' regarding the 'considerable pressure' the 737 MAX program faced over production schedules. The department's letter identifies the 'ero[sion of] safety margins' due to the declining average experience among senior production pilots. [Boeing's] Employee Relations Director . . . . forwarded the

Muilenburg's communications in the weeks following the Lion Air Crash were initiated by a Board request, either as a one-off or as part of a standing protocol. Muilenburg sent them at his discretion.[276] In the absence of a safety mandate, Muilenburg's self-directed communications to the Board focused on discrediting media reports faulting MCAS, and on blaming Lion Air repair shops and crew.

Muilenburg did not send any communication to the Board about the Lion Air Crash until November 5, 2018, roughly one week after it happened.[277] In that email, he disclosed that an airspeed indicator was damaged, but treated the Lion Air crash as a public relations problem and maintained to the Board that the "737 MAX fleet is safe."[278] Muilenburg contacted the Board again after the *WSJ* Article was printed: he gave lip service to the idea that "[t]he safety of our planes is our top priority," but claimed the references to withholding information "are categorically false," that existing flight crew procedures were adequate, and that the 737 MAX was safe.[279] Muilenburg's assurances to the Board that the 737 MAX was safe were based on unreliable information, as he emphasized the "rigorous test program" Boeing

---

communication to defendant Hyslop, Boeing's chief engineer, but . . . mischaracterized the letter as seeking mainly compensation and additional benefits, without flagging the safety concerns of overworked employees.").

[276] *See* Defs.' Ex. 53; Defs.' Ex. 56; Defs.' Ex. 57; Defs.' Ex. 58; Am. Compl. ¶¶ 206, 229.

[277] At argument, Boeing's counsel explained this was so because the crash occurred overseas and in the water. *See* Hr'g Tr. 27.

[278] Defs.' Ex. 55.

[279] Am. Compl. Ex. D.

endured "[t]o earn FAA certification."[280]  His primary focus was the restoration of Boeing's public image.[281]

In the months that followed, Muilenburg's updates focused on Boeing's image and the accident's impact on the 737 MAX's production and delivery schedule, not product safety.[282]  His monthly dashboard reports to the Board and regular updates on Company engineering initiatives addressed production and cost expectation and challenges, but not safety.[283]  He repeatedly told the Board the 737 MAX was safe and blamed pilot and maintenance error.[284]  Nothing indicates that the Board pressed him for more information about the cause of the accident or questioned management's conclusion.[285]

---

[280] *Id.*; *accord* Defs.' Ex. 57.

[281] Am. Compl. Ex. D; *accord* Defs.' Ex. 57.

[282] *See, e.g.*, Defs.' Ex. 56 (focusing on "our strong performance [a]s supported by our continued 737 recovery); Defs.' Ex. 58 (stating that Boeing "must allow [the investigation] to run its course," maintaining the "[b]ottom line" that "the 737 MAX is safe," and ultimately concluding with an update on "737 production" and touting that the Company completed "43 deliveries for October," "an all-time high for the month and a positive sign or production recovery plane and supplier management efforts are working"); Defs.' Ex. 60.

[283] *See* Defs.' Ex. 21; Defs.' Ex. 22 at -18838.

[284] *See, e.g.*, Am. Compl. ¶¶ 218, 225; Defs.' Ex. 58.

[285] While Muilenburg himself was Chairman of the Board at this time, Defendants have not attempted to impute his knowledge to the Board as a whole.  *See* Am. Compl. ¶ 37.

Muilenburg's notes did not reference any Board-level directives for reporting or on investigating the Lion Air Crash.[286] Rather, they indicated that Boeing's management was taking charge while the Board remained a passive recipient of updates: management would "determine whether any action is required," and Muilenburg would "share additional details, if available, in [his] monthly update."[287] Those updates, too, were discretionary and not Board-ordered safety reports.

The Board's reliance on management-directed intermittent safety reporting continued after the Ethiopian Airline Crash. The Board passively accepted Muilenburg's assurances that Boeing's "teams are centered on our priorities, including safety, quality and stability,"[288] as an "ongoing" component of its "production operations";[289] and that public and regulatory backlash was driven solely by "public/political pressure, not by any new facts" about the 737 MAX's safety.[290] The Board did not press for more information. On March 12, Muilenburg emailed the Board about engagement with high federal executive branch officials to

---

[286] *See* Defs.' Ex. 57.

[287] *E.g.*, Defs.' Ex. 55.

[288] Defs.' Ex. 66 at -620851.

[289] *Id.*

[290] Defs.' Ex. 68.

keep the 737 MAX flying.[291]  One outside director praised Muilenburg's "strong leadership."[292]

It was not until April 2019, the month following the Ethiopian Airline Crash, that Boeing's Vice President of BCA Engineering and BCA's Vice President of Safety, Security & Compliance presented to the Board.  This was the first time that the Board or any of its committees heard a presentation from either member of management, "despite their roles leading engineering and safety, respectively, for Boeing's largest segment."[293]

The nature and content of management's *ad hoc* reports to the Board indicate that the Board had no regular process or protocols requiring management to apprise the Board of airplane safety.[294]  Nothing in the Amended Complaint or documents

---

[291] *Id.*

[292] Am. Compl. ¶ 252.

[293] *Id.* ¶ 71.

[294] Hr'g Tr. 14–16 ("THE COURT:  Where can I see that expectation and practice from the board's side rather than management coming forward and – you've pointed me to some examples of management coming forward to the board.  Can you point me to any examples of where the board has expressed its expectation that management do so?  MR. RABINOVITZ:  I can't point you to a written protocol, Your Honor . . . [But] the fact that this practice existed is a meaningful indication of the protocol that did exist between management and the board.  The board doesn't need to say so.  The proof is in the pudding, as it were. . . .  THE COURT:  Just before you do that, just to put a bit of a finer point on it, the protocol that you're offering is manifested only when management chose to elevate issues to the board?  MR. RABINOVITZ:  This specific part, right.  Elevating specific safety issues when management believed they warranted board attention.  I cannot point to that in writing.").

submitted supports the inference that the Board requested those reports or expected those reports to contain safety information.[295]

Management's *ad hoc* reports were also one-sided at best and false at worst, conveying only favorable and optimistic safety updates and assurances that the quality of Boeing's aircraft would drive production and revenue. Management reported its unsupported conclusion that MCAS and the AOA sensor did not cause the crashes and that the 737 MAX remained airworthy and able to meet production goals. Management told the Board that "the function performed by MCAS" was referenced in the Flight Crew Operations Manual, and expressed frustration with public commentary.[296] Muilenburg also told the Board that Boeing was developing a "737 MAX software enhancement that, when implemented, will further improve system safety," and that "[d]espite recent media speculation," nothing had been decided about the "software update and its timing"—understating that "enhancement['s]" lifesaving importance.[297]

Because the Board did not have any formal procedures in place to monitor the safety of Boeing's airplanes, the Board was not privy to the truth about MCAS, AOA sensor vulnerabilities, or how those issues were handled in FAA certification and

---

[295] *See id.* 14–16, 19–21, 32, 47–48.

[296] Am. Compl. ¶ 224.

[297] *Id.* ¶ 234; Defs.' Ex. 63 at -13683.

pilot training. [298]   It accepted Muilenburg's denials, deflections, and repeated insistence that the 737 MAX was safe, even after the press faulted MCAS and insufficient training for the Lion Air Crash.

The fact that management only communicated with the Board regarding safety on an *ad hoc* basis as necessary to further business strategy, and the fact that management only gave the board "certain favorable information" but not "important reports that presented a much different picture," indicate that the Board failed to implement a reasonable reporting system to monitor the safety of Boeing's airplanes.[299]

> ### iv.    Management saw red, or at least yellow, flags, but that information never reached the Board.

In *Marchand*, the Supreme Court agreed with the plaintiff that management's knowledge about growing safety issues in the company and failure to report those issues to the board was "further evidence that the board had no food safety reporting system in place."[300]   Where management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant

---

[298] *See* Hr'g Tr. 32 ("MR. RABINOVITZ:  I do not think there is anything in the record suggesting that the board was briefed on the MCAS at all before the – before the first 737 MAX accident.").

[299] *See Marchand*, 212 A.3d at 822.

[300] *Id.* at 817.

period revealed no evidence that these were disclosed to the board, it is reasonable to infer the absence of a reporting system.[301] Here, as in *Marchand*, Boeing management knew that the 737 MAX had numerous safety defects, but did not report those facts to the Board.

In the critical period leading up to the Lion Air Crash, Boeing management received formal complaints from employees who questioned the safety of the 737 MAX. Further, Boeing's Internal Safety Analysis found that if a pilot took more than ten seconds to identify and respond to the MCAS activation, the result would be catastrophic. Forkner made MCAS's vulnerability issues known within the Company. But before the Lion Air Crash, there is no evidence that management apprised the Board of the AOA disagree sensor's malfunctions or the probability of catastrophic failure.[302]

After the Lion Air Crash, Boeing started revising MCAS and, like the FAA, performed a risk assessment that concluded an unacceptably high risk of catastrophic failure. Boeing also pushed out the Manual Bulletin, and the FAA issued the

---

[301] *Id.* at 822.

[302] *See* Hr'g. Tr. 32 ("MR. RABINOVITZ:  I do not think there is anything in the record suggesting that the board was briefed on the MCAS at all before the – before the first 737 MAX accident.").

Emergency Directive.[303] But management told the Board the 737 MAX was safe, and did not brief the Board on the risks of MCAS.

Thus, safety concerns known to management failed to make their way to the Board, supporting the conclusion that the Board failed to establish a reporting system.

> ***v.***        ***In addition to the inferences drawn above, the pleading-stage record supports an explicit finding of scienter.***

Plaintiffs have pled facts that allowing a reasonable inference that the directors breached their duties of oversight with scienter: not only did the Director Defendants act inconsistently with their fiduciary duties, but they also knew of their shortcomings.[304] In *Marchand*, the Delaware Supreme Court inferred scienter from the lack of any board committee focused on safety; any regular process or protocols requiring management to report on safety risks; any regular schedule for the board to address safety; any board minutes or documents suggesting that they regularly discussed safety; any evidence that red, or at least yellow, flags, were disclosed to the board; and any evidence that management conveyed both favorable and

---

[303] Am. Compl. ¶¶ 189–91.

[304] *See, e.g.*, *Horman*, 2017 WL 242571, at *7 (quoting *Massey*, 2011 WL 2176479, at *22).

unfavorable safety information to the board.[305] Those allegations support an inference of scienter here as well.

But no inference is needed: the difficult scienter element is directly met by the Board's own words. They confirm that directors knew the Board should have had structures in place to receive and consider safety information. Collins's March 15, 2019 email to Calhoun is exemplary. In the absence of Board meetings and discussions about safety before the crashes, Collins pitched that "we should devote the entire board meeting (other than required committee meetings and reports) to a review of quality within Boeing," because "[i]n addition to providing necessary information for the Board, this type of agenda would underscore the board's (and management's) unwavering commitment to quality and safety above all other performance criteria."[306] Collins's follow-up email on the "category of 'lessons learned'" reflected on his and Calhoun's time at Medtronic, where they "began each board meeting, executive committee meeting, and operating review with a review of product quality/safety—before any discussion of financial performance, market share/competitive activities, new product development timetables, and certainly stock price,"[307] so that "everyone in the corporation understood that nothing was

---

[305] *Marchand*, 212 A.3d at 822.

[306] Am. Compl. Ex. C.

[307] *Id.*

more important to the CEO and the board than quality/safety."[308]  In response, Muilenburg "added Safety data to the Board lead-off briefing, and . . . monthly Board note too,"[309] and the Board held its first meetings to formally address airplane safety.

That the Board knowingly fell short is also evident in the Board's public crowing about taking specific actions to monitor safety that it did not actually perform.  Calhoun hustled to "[p]osition the Boeing Board of Directors as an independent body that has exercised appropriate oversight."[310]  He falsely touted that the Board was immediately contacted and met "very, very quickly" after the Lion Air Crash;[311] participated in evaluating the 737 MAX's safety risks; considered grounding the 737 MAX after the Lion Air Crash;[312] met within twenty-four hours of that crash to consider grounding; and recommended grounding.[313]  Each of Calhoun's public representations was knowingly false.[314]  They evidence that at least Calhoun knew what the Board should have been doing all along.

---

[308] *Id.*

[309] *Id.*

[310] Am. Compl. ¶ 263.

[311] *Id.* ¶¶ 268–69.

[312] *Id.* ¶ 271.

[313] *Id.* ¶¶ 274–75.

[314] *See, e.g.*, *id.* ¶¶ 271–76; Defs.' Ex. 69.  As stated, Count I of the Amended Complaint categorizes the Board's public deception as a breach of fiduciary duty.  Although the parties

\* \* \* \* \*

Plaintiffs have met their "onerous pleading burden" under *Caremark* prong one, and are entitled to discovery to prove out that claim.[315] As espoused in *Marchand*, the Board has a rigorous oversight obligation where safety is mission critical, as the fallout from the Board's utter failure to try to satisfy this "bottom-line requirement"[316] can cause "material suffering," even short of death, "among customers, or to the public at large," and attendant reputational and financial harm to the company.[317] Plaintiffs allege a majority of the Director Defendants face liability under that theory, and have stated a claim.

### b. Plaintiffs Have Stated A Post-Lion Air Claim Under *Caremark* Prong Two.

Plaintiffs also contend the Director Defendants face a substantial likelihood of liability under *Caremark* prong two because they ignored the Lion Air Crash and other red flags about the 737 MAX's safety before the Ethiopian Airlines Crash.[318] "To state a prong two *Caremark* claim, Plaintiff must plead particularized facts that the board knew of evidence of corporate misconduct—the proverbial red flag—yet

---

did not focus on that allegation in briefing or at argument, to the extent Plaintiffs pursue the Board's misrepresentations as an independent breach, the Motion is DENIED.

[315] *Marchand*, 212 A.3d at 824.

[316] *Id.* at 821.

[317] *Chou*, 2020 WL 5028065, at \*1.

[318] By the time of the October 2018 Lion Air Crash, Stephenson and McNerney were no longer on the Board.

92

acted in bad faith by consciously disregarding its duty to address that misconduct."[319]

Plaintiffs have done so here.

A classic prong two claim acknowledges the board had a reporting system, but alleges that system brought information to the board that the board then ignored.[320] In this case, Plaintiffs' prong two claim overlaps and coexists with their prong one claim; Plaintiffs assert the Board ignored red flags at the same time they utterly failed to establish a reporting system.[321]

I can appreciate the breadth of Plaintiffs' theory in view of the Board's pervasive failures under prong one and the scale of the tragedy that followed. Boeing's safety issues manifested in the Lion Air Crash—an accident the Board

---

[319] *Id.* at *17 (alterations and internal quotation marks omitted) (quoting *Reiter*, 2016 WL 6081823, at *8).

[320] *See, e.g.*, *Pettry on behalf of FedEx Corp. v. Smith*, 2021 WL 2644475, at *7–12 (Del. Ch. June 28, 2021) (reciting the *Caremark* prong two standard, and finding that the board did not ignore red flags that were elevated through the company's reporting system); *Clovis*, 2019 WL 4850188, at *13 (quoting *Marchand*, 212 A.2d at 821) ("*Caremark*'s second prong is implicated when it is alleged the company implemented an oversight system but the board failed to 'monitor it.'"); *cf. Chou*, 2020 WL 5028065, at *17–26 (concluding that the board consciously ignored red flags that were raised to the board where "Plaintiffs allege[d] that the Director Defendants face a substantial likelihood of liability under *both* prongs of *Caremark*").

[321] *See, e.g.*, *Chou*, 2020 WL 5028065, at *26 ("Because the Complaint survives under a 'prong two' theory, I need not decide whether the Director Defendants face a substantial likelihood of liability under 'prong one' of *Caremark*. I note, however, that the Davis Polk Report indicates that several years after acquiring Specialty, ABC had a woefully inadequate compliance system. While the implication of a 'prong one' claim is unnecessary to survive the Defendants' Motion, it nonetheless speaks to a lax approach (at best) to compliance at ABC.").

93

could not help but learn about, despite the lack of a Board-level monitoring system. Unlike many harms in the *Caremark* context, which include financial misconduct that the board can likely discover only through an internal system, the Board did not require an internal system to learn about the Lion Air Crash and the attendant MCAS failures.[322] The Lion Air Crash and its causes were widely reported in the media; those reports reached the Board; and the Board ignored them.[323]

But I need not decide today whether Plaintiffs' prong two theory is cognizable in view of my conclusion that the Board utterly failed under prong one. Defendants press that "the Board had extensive reporting systems and controls," including its Audit Committee, ERV, ethics and compliance reporting portals, internal audits group, and regular management and legal updates.[324] Assuming Defendants are correct, the Board nonetheless ignored the Lion Air Crash and the consequent revelations about the unsafe 737 MAX.

The Lion Air Crash was a red flag about MCAS that the Board should have heeded but instead ignored. The Board did not request any information about it from management, and did not receive any until November 5, 2018, over one week after it happened. In that communication, Muilenburg advanced management's position

---

[322] *See, e.g.*, Am. Compl. ¶¶ 195–98, 208–09; *id.* Ex. D; Defs.' Ex. 55; Hr'g Tr. 32.

[323] *See* Am. Compl. ¶¶ 195–98, 208–09; *id.* Ex. D; Defs.' Ex. 55.

[324] D.I. 146 at 38.

that the 737 MAX was safe, and the Board passively accepted that position. The November 12 *WSJ* Article circulated the theory that MCAS had serious engineering defects that were concealed from regulators and pilots, which required immediate investigation and remediation. The Board was aware of that article, but did not question management's contrary position. The Section 220 record does not reveal evidence of any director seeking or receiving additional written information about MCAS or the AOA sensor, Boeing's dealings with the FAA, how it had obtained FAA certification, the required amount of pilot training for the 737 MAX, or about airplane safety generally.[325]

When the Board finally convened to address the Lion Air Crash, the call was optional. The full Board did not anchor the tragedy as an agenda item until it met for its regularly scheduled Board meeting in December 2018, and its focus at that meeting was on the continued production of the 737 MAX, rather than MCAS, potential remedial steps, or safety generally.[326] And when the Board eventually considered whether it should investigate the causes of the Lion Air Crash, at the February 2019 Board meeting, the Board formally resolved to "delay any

---

[325] *See In re Tyson Foods, Inc.*, 919 A.2d 563, 578 (Del. Ch. 2007) ("[I]t is more reasonable to infer that exculpatory documents would be provided than to believe the opposite: that such documents existed and yet were inexplicably withheld.").

[326] Am. Compl. ¶ 231–32; Defs.' Ex. 84 at -618203.

investigation until the conclusion of the regulatory investigations or until such time as the Board determines that an internal investigation would be appropriate."[327]

Electing to follow management's steady misrepresentations that the 737 MAX fleet was safe and airworthy, the Board treated the crash as an "anomaly," a public relations problem, and a litigation risk,[328] rather than investigating the safety of the aircraft and the adequacy of the certification process. The Board's declination to test the modicum of information it received and seek the truth of the 737 MAX's safety, despite reported information calling it into question, do not indicate a mere "failed attempt" to address a red flag.[329] As alleged and supported by the Section 220 record, the Board was aware or should have been aware that its response to the Lion Air Crash fell short.[330]

---

[327] Am. Compl. ¶ 238; Pls.' Ex. 4.

[328] Am. Compl. ¶ 271.

[329] *Cf. Richardson v. Clark*, 2020 WL 7861335, at *11 (Del. Ch. Dec. 31, 2020); *In re Qualcomm FCPA S'holder Deriv. Litig.*, 2017 WL 2608723, at *4 (Del. Ch. June 16, 2017).

[330] *See* Am. Compl. Ex. C (addressing "lessons learned' and the Board's need to begin addressing safety in a formal setting); *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 983–84 (Del. Ch. 2013) (finding scienter where company's directors "knew that there were material weaknesses in [the company's] internal controls"); *cf. In re GoPro, Inc.*, 2020 WL 2036602, at *13 (Del. Ch. Apr. 28, 2020) (declining to find that Plaintiffs offered "well-pled facts supporting an inference that a majority of the Demand Board personally *knew* about Karma's defect, could meaningfully address the issue at the Board level and yet elected to do nothing").

**2.**   **Plaintiffs Have Not Pled Particularized Facts Demonstrating The Director Defendants Face A Substantial Likelihood Of Liability With Respect To Muilenburg's Retirement And Compensation.**

Plaintiffs also allege that the Director Defendants consciously breached their fiduciary duties by allowing Muilenburg to receive unvested equity-based compensation in a quiet retirement, despite knowing that he misled the FAA and the Board, and failed in his response to the Lion Air and Ethiopian Airlines Crashes. Plaintiffs couch this claim as one for waste or, in the alternative, bad faith.[331] But Plaintiffs have not alleged particularized facts sufficient to demonstrate that the Director Defendants face a substantial likelihood of liability under these rigorous standards.[332]

Plaintiffs do not meaningfully challenge the independence and disinterestedness of the Board as to the terms of Muilenburg's departure. Plaintiffs theorize the Board bought Muilenburg's silence because he knew the depth of the Board's ignorance about the 737 MAX. Plaintiffs contend that the Board acted out of self-interest by allowing Muilenburg to retire and claim his unvested equity

---

[331] *See* D.I. 155 at 56–61.

[332] This is true whether the Board's decision to terminate Muilenburg is considered under *Aronson* or *Rales*. *See Zuckerberg*, 250 A.3d at 877–90; *see also* D.I. 146 at 58 ("Whether the Board's decision to terminate Muilenburg is considered under *Aronson* or *Rales*, . . .Plaintiffs fail to establish demand futility."); *id.* at 60 (assessing Plaintiffs' claims under *Rales*); D.I. 155 at 38 (citing and applying *Rales*).

because "Muilenburg could have accused the Board members of unfairly scapegoating him for doing what the Board wanted."[333] They argue "[t]he Board's pronounced lack of safety oversight incentivized the Board members not to make an enemy of Muilenburg at a time of public clamor over whether the Board bore any culpability for the mass fatalities and resulting financial catastrophe at Boeing."[334] But Plaintiffs do not plead particularized facts supporting their theory that "[p]aying Muilenburg encouraged his silence about his interactions with the Board."[335] Nothing in the Section 220 production gives rise to the reasonable inference that Muilenburg intended to retaliate against the Board by placing the blame at its feet. This theory is conclusory.

Further, Plaintiffs have not pled particularized facts giving rise to the inference that the Board would face a substantial likelihood of liability under waste or bad faith theories. "[T]he standard for waste is a very high one that is difficult to meet,"[336] and "to prevail on a waste claim the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's

---

[333] D.I. 155 at 59.

[334] *Id.* at 60.

[335] *Id.*

[336] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 759 (Del. Ch. 2005).

best interests."[337]  "[T]o excuse demand on grounds of waste the Complaint must allege particularized facts that lead to a reasonable inference that the director defendants authorized 'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'"[338]  The burden to establish a claim for bad faith is similarly stringent.  A finding of bad faith in the fiduciary context is rare.[339]  "Absent direct evidence of an improper intent, a plaintiff must point to a decision that lacked any rationally conceivable basis . . . to survive a motion to dismiss."[340]

The Amended Complaint and the Section 220 record do not support such claims here, as it is reasonable to infer that the Board was validly exercising its business judgment when it decided to allow Muilenburg to retire with compensation. At that time, Boeing was facing substantial backlash and had spent millions of

---

[337] *Citigroup*, 964 A.2d at 136 (alterations and internal quotation marks omitted).

[338] *Id.*

[339] *See In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *20 (Del. Ch. Mar. 31, 2017) (citing *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016)).  That said, I acknowledge the bulk of this opinion concludes the Director Defendants face liability for bad faith dereliction of their oversight duties.

[340] *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *14 (Del. Ch. Dec. 30, 2019) (alteration and internal quotation marks omitted) (quoting *Chen v. Howard-Anderson*, 87 A.3d 648, 684 (Del. Ch. 2014)); *see also Chelsea Therapeutics*, 2016 WL 3044721, at *1 (stating that in cases where "there is no indication of conflicted interests or lack of independence on the part of the directors," a finding of bad faith should be reserved for situations where "the nature of [the directors'] action can in no way be understood as in the corporate interest: *res ipsa loquitur*").

dollars addressing the 737 MAX corporate trauma. Even accepting as true that the Board allowed Muilenburg to go quietly and with full pockets to avoid further public criticism, it is reasonable to infer that doing so was in furtherance of the legitimate business objective of avoiding further reputational and financial harm to the Company.[341] Accordingly, Plaintiffs have failed to allege particularized facts that the decision to forego Muilenburg's termination for cause "was otherwise the product of a valid exercise of business judgment."[342] The Motion is therefore granted as to Plaintiffs' Muilenburg compensation claims.

## B. The Motion Is Granted As To Count II's Claim Against The Officer Defendants.

Defendants have also moved to dismiss all claims against the Officer Defendants under Rules 23.1 and 12(b)(6). Defendants argue that Plaintiffs do not plead with particularity facts establishing that demand is excused for Count II of their Complaint, alleging breach of fiduciary duty by Boeing's officers.[343]

---

[341] *See Shabbouei v. Potdevin*, 2020 WL 1609177, at *12 (Del. Ch. Apr. 2, 2020) ("[T]he Board was operating well-within the bounds of proper business judgment when it decided to settle with [the former CEO] rather than fire him 'for cause,' a decision that could have embroiled the Company in an embarrassing legal battle with its former CEO."); *Seinfeld v. Slager*, 2012 WL 2501105, at *6 (Del. Ch. June 29, 2012) ("Other factors may also properly influence the board, including ensuring a smooth and harmonious transfer of power, securing a good relationship with the retiring employee, preventing future embarrassing disclosure and lawsuits, and so on.").

[342] *Aronson*, 473 A.2d at 814.

[343] D.I. 146 at 60.

Defendants further argue that Delaware does not recognize *Caremark* claims against officers, and that Plaintiffs have failed to allege that the Officer Defendants breached their duty of care.[344]

In briefing, Plaintiffs did not address Defendants' demand futility arguments as to Count II.[345] Instead, Plaintiffs' theory under Rule 23.1 presumably turns on the assumption that the Officer Defendants can face *Caremark* liability, and that therefore demand was futile as to all Defendants facing the same claim. But Plaintiffs have not pled this with the requisite particularity, nor have they argued that any of the Director Defendants are beholden to or dominated by the Boeing officers such that they would be unable to assess Count II regardless of the theory of liability.[346] Indeed, the Amended Complaint's demand futility allegations do not address the Officer Defendants, asserting only that "a majority of the members of the Board have faced a substantial likelihood of liability for failing to make any good faith effort to implement and oversee a board-level system to monitor and report on

---

[344] *See id.* at 61–62.

[345] *See generally* D.I. 155; D.I. 159 at 33.

[346] *E.g.*, *In re MetLife, Inc. Deriv. Litig.*, 2020 WL 4746635, at *13 n.186 (Del. Ch. Aug. 17, 2020) (pointing out that plaintiffs did not argue that any board members were beholden to management so as to disable them from evaluating the claims); *Rales*, 634 A.2d at 936.

safety."[347]  Accordingly, Count II is dismissed pursuant to Rule 23.1, and therefore I need not address Defendants' arguments under Rule 12(b)(6).

### III.  CONCLUSION

The Motion is **GRANTED** in part and **DENIED** in part.  The parties shall submit an implementing order with twenty days of this decision.

---

[347] Am. Compl. ¶ 299.